# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

# PORTLAND DIVISION

3:19-cv-1670

Case No.

| | |
|---|---|
| **United States Federal Government**<br>    For the United States of America, | **QUI TAM CLASS ACTION FOR:**<br>violations of Sections 11, 12(a)(2), and 15 of<br>the Securities Act of 1933, 15 U.S.C. §§ 77k, |
| **Federal Housing Finance Agency,** | 77l(a)(2), 77o, Sections 13.1-522(A)(ii) and<br>13.1-522(C) of the Virginia Code, Sections 31- |
| **Freddie Mae and Freddie Mac (GSE's)** | 5606.05(a)(1)(B) and 31-5606.05(c) of the<br>District of Columbia Code; common law |
| **Salish Skajet Kwabacabs Tribal<br>Republic (SSKTR),** | negligent misrepresentation; Trespass;<br>Trespass on the Case; False Claims Act<br>Violations |
| **William X Nietzche (solely as<br>Trustee for SSKTR Trust),**<br>        Relator, | |
| **William Kinney Jr (solely as Beneficiary<br>of SSKTR Trust),**<br>        Plaintiff/Petitioner Class, | (Action at Law pursuant to 31 U.S.C. §§<br>3729-3733; FRCP 23 and 18 U.S.C. § 242)<br><br>**(DEMAND FOR JURY TRIAL)**<br>**(VERIFIED)** |
| **Julie Ann Metcalf Kinney (solely as<br>Beneficiary of SSKTR Trust),**<br>        Plaintiff/Petitioner Class, | |

v.

**HSBC NORTH AMERICA HOLDINGS INC. (HSBC Defendants),**

**HSBC USA INC. (HSBC Defendants),**

**HSBC MARKETS (USA) INC. (HSBC Defendants),**

**HSBC BANK USA, N.A. (HSBC Defendants),**

**HSI ASSET SECURITIZATION CORPORATION (HSBC Defendants),**

**HSBC SECURITIES (USA) INC. (HSBC Defendants),**

**Neal Leonard (in both public and private<br>capacities) (HSBC Defendants),**

Gerard Mattia (in both public and private
capacities) (HSBC Defendants),

Todd White (in both public and private
capacities) (HSBC Defendants),

Norman Chaleff (in both public and private
capacities) (HSBC Defendants),

Jon Voigtman (in both public and private
capacities) (HSBC Defendants),

URBAN HOUSING DEVELOPMENT (UHD),

Roman Ozeruga (in both public and private
capacities) (State Actor Defendants),

Mark G. Passanante (in both public and private
capacities) (State Actor Defendants),

Robert S. Phed (in both public and private
Capacities) (State Actor Defendants),

Terrance Slominski (in both public and private
capacities) (State Actor Defendants),

Michael H. Simon (in both public and private
capacities) (State Actor Defendants),

Tom Purcell (in both public and private
capacities) (State Actor Defendants),

Steve Pite (in both public and private
capacities) (State Actor Defendants),

John G. Aldridge (in both public and private
capacities) (State Actor Defendants),

Lawrence Randell Weisberg (in both public and private
capacities) (State Actor Defendants),

Stephen Bushong (in both public and private
capacities) (State Actor Defendants),

**Stephen A Todd (in both public and private
capacities) (State Actor Defendants),
                Defendant(s)/Respondent(s)**

---

## QUI TAM CLASS ACTION

COMES NOW Plaintiffs in this court of record, by and through Plaintiff/trustee/relator
William X Nietzche, a People of Salish Multnomah Territory, to bring this verified qui
tam class action summoning HSBC North America Holdings Inc. ("HSBC North
America"), HSBC USA Inc. ("HSBC USA"), HSBC Markets (USA) Inc. ("HSBC
Markets"), HSBC Bank USA, N.A. ("HSBC Bank"), HSI Asset Securitization
Corporation ("HSI Asset"), HSBC Securities (USA) Inc. ("HSBC Securities")
(collectively, "HSBC" or the "HSBC Defendants"), Neal Leonard, Gerard Mattia, Todd
White, Norman Chaleff, and Jon Voigtman (the "Individual HSBC Defendants")
(together with the HSBC Defendants, the "Defendants") URBAN HOUSING
DEVELOPMENT ("UHD"), Roman Ozeruga ("Rom Oz"), Mark G. Passanante ("M
Pass"), Terrance Slominski ("T Slo"), Michael H. Simon ( M Sim), Tom Purcell ("T
Pur"),  Robert S. Phed ("R Phed"), Steve W. Pite ("S Pite"), John G. Aldridge ("J
Aldridge"), Lawrence Randell Weisberg ("L Weis"), Stephen Bushong ("S Bush"),
Stephen A. Todd ("S Todd"), (hereinafter State Actor Defendants), to answer Plaintiffs in
a plea for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15
U.S.C. §§ 77k, 77l(a)(2), 77o, Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia
Code,  Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia
Code, and for common law negligent misrepresentation, Libel, Trespass, Trespass on the
Case, False Claims Act violations, to wit:

### NATURE OF ACTION

1.  This action arises out of Defendants' further actionable conduct in connection with the
offer and sale of certain residential mortgage-backed securities to Fannie Mae and Freddie
Mac collectively, the "Government Sponsored Enterprises" (or "GSEs").  Plaintiffs
William and Julie Metcalf Kinney (hereinafter referred "the Kinneys") are the original
source of information having first-hand knowledge that is independent of and materially
adds to the publicly disclosed allegations as alleged below made towards the HSBC
Defendants in 2011 by the FHFA. The Kinney's loan was found in a tainted securitization
pool that was discovered by a certified forensic loan audit conducted in 2018. These
securities were sold pursuant to registration statements, including prospectuses and
prospectus supplements that formed part of those registration statements, which contained
materially false or misleading statements and omissions.  Defendants falsely represented
that the underlying mortgage loans complied with certain underwriting guidelines and
standards, including representations that significantly overstated the ability of the
borrowers to repay their mortgage loans.  These representations were material to the GSEs,
as reasonable investors, and their falsity violates Sections 11, 12(a)(2), and 15 of the
Securities Act of 1933, 15 U.S.C. § 77a et seq., Sections 13.1-522(A)(ii) and 13.1-522(C)
of the Virginia Code, Sections 31-5606.05(a)(1)(B) and 315606.05(c) of the District of
Columbia Code, and constitutes common law negligent misrepresentation. Also, by virtue
of the underlying acts committed by Defendants further described below, the Defendants

made, used, or caused to be made or used, false records or statements material to false or fraudulent claims made to the SEC and other Federal U.S. governmental agencies in direct violation of, inter alia, 31 U.S.C. § 3729(a)(1)(B) of the False Claims Act (FCA).

2. Between December 20, 2005 and July 3, 2007, Fannie Mae and Freddie Mac purchased over $6.2 billion in residential mortgage-backed securities (the "GSE Certificates") issued in connection with 17 HSBC-sponsored securitizations[1]. The GSE Certificates purchased by Freddie Mac, along with the date and amount of the purchases, are listed infra in Table 10. The GSE Certificates purchased by Fannie Mae, along with the date and amount of the purchases, are listed infra in Table 11. On information and belief, the Kinney's securitization involve the same set of allegations as pertaining to the 17 securitizations at issue in this case, and thus would constitute the 18th securitization at issue in this matter. Relators need to propound further discovery to ascertain the particulars in this matter. The 18 securitizations at issue are:

i. First Franklin Mortgage Loan Trust 2006-FF1, Mortgage Pass-Through Certificates, Series 2006-FF1 ("FFML 2006-FF1")

ii. First Franklin Mortgage Loan Trust 2006-FF5, Mortgage Pass-Through Certificates, Series 2006-FF5 ("FFML 2006-FF5")

iii. First Franklin Mortgage Loan Trust 2006-FF7, Mortgage Pass-Through Certificates, Series 2006-FF7 ("FFML 2006-FF7")

iv. First Franklin Mortgage Loan Trust 2006-FF9, Mortgage Pass-Through Certificates, Series 2006-FF9 ("FFML 2006-FF9")

v. First Franklin Mortgage Loan Trust 2006-FF11, Mortgage Pass-Through Certificates, Series 2006-FF11 ("FFML 2006-FF11")

vi. HSI Asset Securitization Corporation Trust 2005-I1, Mortgage Pass-Through Certificates, Series 2005-I1 ("HASC 2005-I1")

vii. HSI Asset Securitization Corporation Trust 2006-HE1, Mortgage Pass-Through Certificates, Series 2006-HE1 ("HASC 2006-HE1")

viii. HSI Asset Securitization Corporation Trust 2006-HE2, Mortgage Pass-Through Certificates, Series 2006-HE2 ("HASC 2006-HE2")

ix. HSI Asset Securitization Corporation Trust 2006-NC1, Mortgage Pass-Through Certificates, Series 2006-NC1 ("HASC 2006-NC1")

x. HSI Asset Securitization Corporation Trust 2006-OPT1, Mortgage Pass-Through Certificates, Series 2006-OPT1 ("HASC 2006-OPT1")

---

[1] For purposes of this Complaint, the securities issued under the Registration Statements (as defined in note 2, infra) are referred to as "Certificates," while the particular Certificates that Fannie Mae and Freddie Mac purchased are referred to as the "GSE Certificates." Holders of Certificates are referred to as "Certificateholders."

xi. HSI Asset Securitization Corporation Trust 2006-OPT2, Mortgage Pass-Through Certificates, Series 2006-OPT2 ("HASC 2006-OPT2")

xii. HSI Asset Securitization Corporation Trust 2006-OPT3, Mortgage Pass-Through Certificates, Series 2006-OPT3 ("HASC 2006-OPT3")

xiii. HSI Asset Securitization Corporation Trust 2006-OPT4,  Mortgage Pass-Through Certificates, Series 2006-OPT4 ("HASC 2006-OPT4")

xiv. HSI Asset Securitization Corporation Trust 2007-HE1 Mortgage Pass-Through Certificates, Series 2007-HE1 ("HASC 2007-HE1")

xv. HSI Asset Securitization Corporation Trust 2007-HE2, Mortgage Pass-Through Certificates, Series 2007-HE2 ("HASC 2007-HE2")

xvi. HSI Asset Securitization Corporation Trust 2007-OPT1, Mortgage Pass-Through Certificates, Series 2007-OPT1 ("HASC 2007-OPT1")

xvii. HSI Asset Securitization Corporation Trust 2007-WF1, Mortgage Pass-Through Certificates, Series 2007-WF1 ("HASC 2007-WF1")

THE KINNEY'S SECURITIZATION (ORIGINAL SOURCE INFORMATION):

xviii. HSBC Home Equity Loan Trust 2005-1, Close-End Home Equity Loan Asset Backed Notes, Series 2005-1, Mortgage Pass-Through Certificates, Series 2005-HE1

(collectively, the "Securitizations").

3.  The Certificates were offered for sale pursuant to one of three shelf registration statements (the "Shelf Registration Statements") filed by Defendant HSI Asset with the Securities and Exchange Commission (the "SEC"). The three Shelf Registration Statements, and the amendments thereto, were signed by or on behalf of the Individual Defendants. For all of the Securitizations, HSBC Securities was the lead underwriter and the underwriter who sold the GSE Certificates to the GSEs.

4.  For each Securitization, a prospectus ("Prospectus") and prospectus supplement ("Prospectus Supplement") were filed with the SEC as part of the Registration Statement[2] for that Securitization. The GSE Certificates were marketed and sold to Fannie Mae and Freddie Mac pursuant to the Registration Statements, including the Shelf Registration Statements and the corresponding Prospectuses and Prospectus Supplements.

5.  The Registration Statements contained statements about the characteristics and credit quality of the mortgage loans underlying the Securitizations, and the origination and underwriting practices used to make and approve the loans. Such statements were material to a reasonable investor's decision to invest in mortgage-backed securities by purchasing the Certificates. Unbeknownst to Fannie Mae and Freddie Mac, these statements were

---

[2] The term "Registration Statement" as used herein incorporates the Shelf Registration Statement, the Prospectus and the Prospectus Supplement for each referenced Securitization, except where otherwise indicated.

materially false, as significant percentages of the underlying mortgage loans were not originated in accordance with the represented underwriting standards and origination practices, and had materially poorer credit quality than what was represented in the Registration Statements.

6. The Registration Statements also contained statistical summaries of the groups of mortgage loans in each Securitization, such as the percentage of loans secured by owner occupied properties and the percentage of the loan group's aggregate principal balance with loan-to-value ratios within specified ranges. This information also was material to reasonable investors. However, a loan-level analysis of a sample of loans for each Securitization—a review that encompassed thousands of mortgages across all of the Securitizations—has revealed that these statistics were also false and omitted material facts due to inflated property values and misstatements of other key characteristics of the mortgage loans.

7. For example, the percentage of owner-occupied properties is a material risk factor to the purchasers of Certificates, such as Fannie Mae and Freddie Mac, since a borrower who lives in a mortgaged property is generally less likely to stop paying his or her mortgage and more likely to take better care of the property. The loan-level review reveals that the true percentage of owner-occupied properties for the loans supporting the GSE Certificates was materially lower than what was stated in the Prospectus Supplements. Likewise, the Prospectus Supplements misrepresented other material factors, including the true value of the mortgaged properties relative to the amount of the underlying loans.

8. Defendants HSBC Securities (an underwriter), HSI Asset (a depositor), and the Individual Defendants are directly responsible for the misstatements and omissions of material fact contained in the Registration Statements because they prepared, signed, filed and/or used these documents to market and sell the Certificates to Fannie Mae and Freddie Mac.

9. Defendants HSBC North America, HSBC USA, HSBC Markets, HSBC Bank, and the Individual Defendants are also responsible for the misstatements and omissions of material fact contained in the Registration Statements by virtue of their direction and control over Defendants HSBC Securities and HSI Asset. HSBC North America, HSBC USA, and HSBC Markets directly participated in and exercised dominion and control over the business operations of HSBC Securities and HSI Asset. HSBC Bank (the sponsor) directly participated in and exercised dominion and control over the business operations of HSI Asset.

10. Fannie Mae and Freddie Mac purchased over $6.2 billion of the Certificates pursuant to the Registration Statements filed with the SEC. These documents contained misstatements and omissions of material facts concerning the quality of the underlying mortgage loans and the practices used to originate such loans. As a result of Defendants' misstatements and omissions of material fact, Fannie Mae and Freddie Mac have suffered substantial losses as the value of their holdings has significantly deteriorated.

11. Plaintiffs/Relators, on behalf of the Plaintiff class that constitutes the original source information, and as Private Attorney General for Fannie Mae and Freddie Mac, brings this

action against the Defendants for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2), 77o, Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code,  Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code, and for common law negligent misrepresentation.

## PARTIES

PLAINTIFFS AND GSE'S

12. Plaintiff United States Federal Government for the United States of America is the De Jure Republican form of Government as established and ordained by We the People in the Constitution for the United States of America 1791.

13. The Federal Housing Finance Agency is a federal agency located at 1700 G Street, NW in Washington, D.C.  FHFA was created on July 30, 2008 pursuant to the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654 (2008) (codified at 12 U.S.C. § 4617), to oversee Fannie Mae, Freddie Mac, and the Federal Home Loan Banks.  On September 6, 2008, under HERA, the Director of FHFA placed Fannie Mae and Freddie Mac into conservatorship and appointed FHFA as conservator.  In that capacity, FHFA has the authority to exercise all rights and remedies of the GSEs, including, but not limited to, the authority to bring suits on behalf of and/or for the benefit of Fannie Mae and Freddie Mac.  12 U.S.C. § 4617(b)(2).

14. Fannie Mae and Freddie Mac are government-sponsored enterprises chartered by Congress with a mission to provide liquidity, stability and affordability to the United States housing and mortgage markets.  As part of this mission, Fannie Mae and Freddie Mac invested in residential mortgage-backed securities.  Fannie Mae is located at 3900 Wisconsin Avenue, NW in Washington, D.C.  Freddie Mac is located at 8200 Jones Branch Drive in McLean, Virginia.

15. Plaintiff SSKTR is an ultra-sovereign cannon law express trust domiciled at Northwest Amexum (also known as North, Central and South America Republic); SSKTR is a constituent branch of our United States Federal Government.

16. Plaintiff William X Nietzche, One of the People, is the Supreme Chief Trustee of SSKTR, also Qui Tam Relator.

17. Plaintiff William Kinney Jr, One of the People (hereinafter referred to individually as "Plaintiff William"; referred together with Julie Metcalf Kinney as "the Kinney's"; referred to collectively as "Plaintiff Class") is a beneficiary under SSKTR and original source of information pertaining to the instigation of this Qui Tam Class Action lawsuit; he is constituted as part of the class who has suffered the same or similar type of misconduct by Defendants as alleged in this action.

18. Plaintiff Julie Ann Metcalf Kinney, One of the People (hereinafter referred to individually as "Plaintiff Julie"; referred together with William Kinney Jr as "the Kinney's"; referred to collectively as "Plaintiff Class") is a beneficiary under SSKTR and original source of

information pertaining to the instigation of this Qui Tam Class Action lawsuit. She is constituted as part of the class who has suffered the same or similar type of misconduct by Defendants as alleged in this action.

DEFENDANTS

19. Defendant HSBC North America is a Delaware corporation and headquartered at 452 Fifth Avenue, New York, New York 10018. It is one of the nation's ten largest bank holding companies by assets and is a wholly owned subsidiary of HSBC Holdings plc, one of the world's largest banking groups by assets.

20. Defendant HSBC USA is a Maryland corporation and headquartered at 452 Fifth Avenue, New York, New York 10018. It is a wholly owned subsidiary of HSBC North America. HSBC USA's principal subsidiary is HSBC Bank.

21. Defendant HSBC Markets is a Delaware corporation with its principal place of business at 452 Fifth Avenue, New York, New York 10018. It is a wholly owned subsidiary of HSBC North America and the direct parent of HSI Asset and HSBC Securities.

22. Defendant HSBC Securities is a Delaware corporation with its principal place of business at 452 Fifth Avenue, New York, New York 10018. HSBC Securities is a direct, wholly owned subsidiary of HSBC Markets. HSBC Securities is an SEC-registered broker dealer. It was the lead underwriter for each of the Securitizations, and was intimately involved in the offerings. Fannie Mae and Freddie Mac purchased all of the GSE Certificates from HSBC Securities in its capacity as the underwriter of the Securitizations.

23. Defendant HSBC Bank, a national banking association, is a New York corporation with its principal place of business at 452 Fifth Avenue, New York, New York 10018. HSBC Bank is the principal subsidiary of HSBC USA. HSBC Bank was the sponsor for all of the Securitizations.

24. Defendant HSI Asset is a Delaware corporation with its principal place of business at 452 Fifth Avenue, New York, New York 10018. HSI Asset is a direct, wholly owned subsidiary of HSBC Markets. HSI Asset was the depositor for all the Securitizations at issue in this action. HSI Asset, as the depositor, was also responsible for preparing and filing reports required under the Securities Exchange Act of 1934.

25. Defendant Neal Leonard is an individual residing in Mount Kisco, New York. Mr. Leonard was, at relevant times, Chairman, Principal Executive Officer, and Director of HIS Asset. He was also co-head of mortgage-backed securities at HSBC Securities. Mr. Leonard signed all three Shelf Registration Statements and the amendments thereto, and, upon information and belief, did so in New York, New York.

26. Defendant Gerard Mattia is an individual residing in Armonk, New York. Mr. Mattia was, at relevant times, Treasurer, Principal Financial Officer, Principal Accounting Officer, and a Director of HSI Asset. He was also an inside director of HSBC Securities. Mr. Mattia

signed all three Shelf Registration Statements and the amendments thereto, and, upon information and belief, did so in New York, New York.

27. Defendant Todd White is an individual residing in Hamel, Minnesota. Mr. White was, at relevant times, co-head of mortgage-backed securities at HSBC Securities. He was also a Director of HSI Asset. Mr. White signed all three Shelf Registration Statements and the amendments thereto, and, upon information and belief, did so in New York, New York.

28. Defendant Norman Chaleff is an individual residing in West Orange, New Jersey. Mr. Chaleff was, at relevant times, a Director of HSI Asset. Mr. Chaleff signed one Shelf Registration Statement and, upon information and belief, did so in New York, New York.

29. Defendant Jon Voigtman is an individual residing in Summit, New Jersey. Mr. Voigtman was, at relevant times, a Managing Director at both HSBC Securities and HSI Asset. Mr. Voigtman signed two Shelf Registration Statements, as well as amendments to one of those Shelf Registration Statements, and the amendment to another Shelf Registration Statement, and, upon information and belief, did so in New York, New York.

### The Non-Party Originators

30. The loans underlying the Certificates were acquired by HSBC Bank, as the sponsor for each Securitization, from non-party mortgage originators. The originators principally responsible for the loans underlying the Certificates include First Franklin Financial Corporation ("First Franklin"); Option One Mortgage Corporation ("Option One"); New Century Mortgage Corporation ("New Century"); WMC Mortgage Corp. ("WMC"); and Countrywide Home Loans, Inc. ("Countrywide")*; Homecomings Financial ("Homecomings"); Regional Trustee Services; Beneficial Oregon Incorporated ("BOI"); Beneficial 1 Incorporated.

### STATE ACTOR DEFENDANTS IN THE KINNEY CASE

31. Defendant URBAN HOUSING DEVELOPMENT LLC is a de facto corporation residing in Portland Oregon.

32. Defendant Roman Ozeruga, in his public capacity, is a U.S. citizen; in his private capacity he is owner of URBAN HOUSING DEVELOPMENT; Ozeruga is the alter-ego of URBAN HOUSING DEVELOPMENT LLC.

33. Defendant Michael H. Simon, in his public capacity, is a U.S. citizen; in his private capacity he is purportedly acting as an administrative Judge employed by the U.S. District Court for the District of Oregon Portland Division; Simon is the alter-ego of URBAN HOUSING DEVELOPMENT LLC.

34. Defendant Mark G. Passanante, in his public capacity, is a U.S. citizen; in his private capacity he is employed as an attorney for Broer and Passanante, located in Portland Oregon. Passanante is the alter-ego of URBAN HOUSING DEVELOPMENT LLC.

35. Defendant Robert S. Phed, in his public capacity, is a U.S. citizen; in his private capacity he is employed as an attorney for Broer and Passanante. Phed is the alter-ego of URBAN HOUSING DEVELOPMENT LLC.

36. Defendant Terrance Slominski, in his public capacity, is a U.S. citizen; in his private capacity he is employed as an attorney for Slominski and Associates. Slominski is the alter-ego of URBAN HOUSING DEVELOPMENT LLC.

37. Defendant Tom Purcell, in his public capacity is a U.S. citizen; in his private capacity he is employed as an attorney for MB Law Group. Purcell is the alter-ego of URBAN HOUSING DEVELOPMENT LLC.

38. Defendant Steve Pite, in his public capacity, is a U.S. citizen; in his private capacity he is owner of Aldridge and Pite Law firm located in California. Pite is the alter-ego of URBAN HOUSING DEVELOPMENT LLC.

39. Defendant John G. Aldridge, in his public capacity, is a U.S. citizen; in his private capacity he is owner of Aldridge and Pite Law firm located in California. Aldridge is the alter-ego of URBAN HOUSING DEVELOPMENT LLC.

40. Defendant Lawrence Randell Weisberg, in his public capacity, is a U.S. citizen, purportedly acting as an administrative Judge employed by the Multnomah County Court House, Portland Oregon; Weisberg is the alter-ego of URBAN HOUSING DEVELOPMENT LLC.

41. Defendant Stephen Bushong, in his public capacity, is a U.S. citizen; in his private capacity he is purportedly acting as an administrative Judge employed by the Multnomah County Court House, Portland Oregon; Bushong is the alter-ego of URBAN HOUSING DEVELOPMENT LLC.

42. Defendant Stephen Todd, in his public capacity, is a U.S. citizen; in his private capacity he is purportedly acting as an administrative Judge employed by the Multnomah County Court House, Portland Oregon; Todd is the alter-ego of URBAN HOUSING DEVELOPMENT LLC.

## *JURISDICTION AND VENUE

43. Jurisdiction of this Court of Record is founded upon 31 U.S.C. § 3729-33, which gives federal courts original jurisdiction over claims brought by private citizens in its capacity as private U.S. attorney general for the U.S. Federal Government and/or any U.S. Government Sponsored Enterprises (GSE's), including but not limited to: Fannie Mae and Freddie Mac.

44. Jurisdiction of this Court of Record, in particular, is founded upon 31 U.S.C.S. § 3730(e)(4), because relators William Kinney Jr and Julie Metcalf Kinney have direct and independent knowledge that is independent of and materially adds to the publicly disclosed allegations and/or transactions relating to RMBS fraud committed by Defendants against

the U.S. Federal Government; said relators have previously voluntarily provided said information to the United States via U.S. District Court case(s)#3:18-cv-01930; U.S. Court of Appeals for the 9th circuit case(s)#19-35876; relators are the "original source" of the information in furtherance of previously public disclosed allegations relating to RMBS fraud committed against the U.S. Federal Government.

45. Jurisdiction of this Court of Record is also founded upon 28 U.S.C. § 1331 because the Securities Act claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), 77o. This Court of Record further has jurisdiction over the Securities Act claims pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.

46. This Court of Record has jurisdiction over the statutory claims of violations of Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code and Sections 31-5606.05(a)(1)(B) and 31 5606.05(c) of the District of Columbia Code, pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a). This Court of Record also has jurisdiction over the common law claim of negligent misrepresentation pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).

47. The court has personal jurisdiction over the Defendants.

48. There are substantial litigation-related contacts between Defendants and Oregon, as further described below.

49. Venue is proper in this district pursuant to 28 U.S.C. § 1332(a) as there is complete diversity between the Plaintiffs and Defendants; Venue is also proper pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b). All of the HSBC Defendants are principally located in the southern district of New York, two of the Individual Defendants reside in the Southern district of New York, and many of the acts and transactions alleged herein, including the preparation and dissemination of the Registration Statements, occurred in substantial part within the Southern district of New York. Defendants are also subject to personal jurisdiction of the District of Oregon.

50. Venue is proper because a substantial part of the acts or omissions giving rise to the claim occurred in Salish / Multnomah Territory [Oregon Republic];

51. and the real property structure(s) being foreclosed upon are located in Salish / Multnomah Territory [Portland, Oregon] Republic.

52. This Court has personal jurisdiction over Defendants because the Defendants have transacted business in this District, and because Defendants have committed acts proscribed by the False Claims Act in this District.

53. 33. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the action arises under the laws of the United States, pursuant to 28 U.S.C. § 1345 because this

is a civil action commenced by the United States, pursuant to 28 U.S.C. § 1355(a) because this is an action for the recovery or enforcement of a fine or penalty incurred under an Act of Congress, and pursuant to 31 U.S.C. § 3732(a) to the extent the claims arise under the False Claims Act, 31 U.S.C. §§ 3729 to 3733.

54. 34.  Pursuant to 31 U.S.C. § 3732(b), this Court has jurisdiction over the subject matter of the claims asserted by the Relators in this action because those claims are so related to the claims asserted by the United States that they form part of the same case or controversy, and because those claims arise out of the same transactions or occurrences as the action brought by the United States under the False Claims Act, 31 U.S.C. §§ 3729 to 3733.

55. 35.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) and 31 U.S.C. § 3732(a).

56. 36.  Relators have presented the Government with timely disclosures regarding the False Claims Act violations described herein as required by 31 U.S.C. § 3730 (b) (2).


APPLICABLE LAW

57. 31 U.S.C. § 3729(a)(I)(A) provides that any person who knowingly presents or causes to be presented to the United States any false or fraudulent claim for payment or approval is liable to the United States Government both for a civil penalty and for three times the amount of damages which the Government sustains because of the act of that person. The current civil penalty is not less than $5,500 and not more than $11,000 per false claim made. 20 C.F.R. § 356.3.

58. 31 U.S.C. § 3729(a)(1)(B) provides that any person who knowingly  makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim is liable to the United States Government both for a civil penalty and for three times the amount of damages which the Government sustains because of the act of that person. The current civil penalty is not less than $5,500 and not more than $11,000 per false claim made. 20 C.F.R. § 356.3.

59. The False Claims Act defines a "claim" to include any request or demand made upon an agency of the United States for payment of money. 31 U.S.C. § 3729(b)(2).  As a result of submitting Form 571 to Fannie Mae, often multiple times, on loans Defendant Trustees knew could not be modified, Defendant Trustees have made such claims upon the Government.  A false claim exists whenever the United States incurs any cost or is asked to pay any amount in connection with a fraudulently induced guaranty.

60. No proof of specific intent to defraud is required to prove a False Claims Act violation. The terms "knowing" and "knowingly" are defined to mean that a person (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the

information; or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(l).

## FACTS
### I.      THE SECURITIZATIONS
### A. RESIDENTIAL MORTGAGE BACKED SECURITIES IN GENERAL

61. Asset-backed securitization distributes risk by pooling cash-producing financial assets and issuing securities backed by those pools of assets. In residential mortgage-backed securitizations, the cash-producing financial assets are residential mortgage loans.

62. The most common form of securitization of mortgage loans involves a sponsor—the entity that acquires or originates the mortgage loans and initiates the securitization—and the creation of a trust, to which the sponsor directly or indirectly transfers a portfolio of mortgage loans. The trust is generally established pursuant to a Pooling and Servicing Agreement entered into by, among others, the "depositor" for that securitization. In many instances, the transfer of assets to a trust "is a two-step process: the financial assets are transferred by the sponsor first to an intermediate entity, often a limited purpose entity created by the sponsor . . . and commonly called a depositor, and then the depositor will transfer the assets to the [trust] for the particular asset-backed transactions." Asset-Backed Securities, Securities Act Release No. 33-8518, Exchange Act Release No. 34-50905, 84 SEC Docket 1624 (Dec. 22, 2004).

63. Residential mortgage-backed securities are backed by the underlying mortgage loans. Some residential mortgage-backed securitizations are created from more than one cohort of loans called collateral groups, in which case the trust issues securities backed by different groups. For example, a securitization may involve two groups of mortgages, with some securities backed primarily by the first group, and others primarily by the second group. Purchasers of the securities acquire an ownership interest in the assets of the trust, which in turn owns the loans. Within this framework, the purchasers of the securities acquire rights to the cash-flows from the designated mortgage group, such as homeowners' payments of principal and interest on the mortgage loans held by the related trust.

64. Residential mortgage-backed securities are issued pursuant to registration statements filed with the SEC. These registration statements include prospectuses, which explain the general structure of the investment, and prospectus supplements, which contain detailed descriptions of the mortgage groups underlying the certificates. Certificates are issued by the trust pursuant to the registration statement, the prospectus and the prospectus supplement. Underwriters sell the certificates to investors.

65. A mortgage servicer is necessary to manage the collection of proceeds from the mortgage loans. The servicer is responsible for collecting homeowners' mortgage loan payments, which the servicer remits to the trustee after deducting a monthly servicing fee. The servicer's duties include making collection efforts on delinquent loans, initiating foreclosure proceedings, and determining when to charge off a loan by writing down its balance. The servicer is required to report key information about the loans to the trustee.

The trustee (or trust administrator) administers the trust's funds and delivers payments due each month on the certificates to the investors.

### B. SECURITIZATIONS AT ISSUE IN THIS CASE

66. This case involves the 17 Securitizations listed in paragraph 2 supra; and the Kinney's Securitization all of which were sponsored by HSBC Bank and underwritten by HSBC Securities. For the 17 Securitizations relating to prior allegations,

67. Table 1 identifies: (1) the sponsor; (2) the depositor; (3) the lead underwriter; (4) the principal amount issued for the tranches[3] purchased by the GSEs; (5) the date of issuance; and (6) the loan group or groups backing the GSE Certificate for that Securitization (referred to as the "Supporting Loan Groups").

68. On information and belief, the Kinney's Securitization involve the same set allegations as pertaining to the 17 Securitizations; Plaintiffs need to propound further discovery to identify the particulars pertaining to the Kinney's Securitizations.

---

[3] A tranche is one of a series of certificates or interests created and issued as part of the same transaction.

Table 1

| Transaction | Tranche | Sponsor | Depositor | Lead Underwriter | Principal Amount Issued ($) | Date of Issuance | Supporting Loan Group |
|---|---|---|---|---|---|---|---|
| HMIC 2006-FF4 | 1A | HSBC Bank | HSI Asset | HSBC Securities | 266,292,000.00 | 4.27.2006 | Group I |
| HMIC 2006-FF5 | 1A | HSBC Bank | HSI Asset | HSBC Securities | 493,140,000.00 | 5.5.2006 | Group I |
| HMIC 2006-FF7 | 1A | HSBC Bank | HSI Asset | HSBC Securities | 336,693,000.00 | 5.31.2006 | Group I |
| HMIC 2006-FF9 | 1A | HSBC Bank | HSI Asset | HSBC Securities | 513,134,000.00 | 7.7.2006 | Group I |
| HMIC 2006-FF11 | 1A1 | HSBC Bank | HSI Asset | HSBC Securities | 543,964,000.00 | 9.6.2006 | Group I |
| | 1A2 | HSBC Bank | HSI Asset | HSBC Securities | 136,994,200.00 | 9.6.2006 | Group I |
| HASC 2005-FF1 | 1A | HSBC Bank | HSI Asset | HSBC Securities | 132,963,000.00 | 12.20.2005 | Group I |
| HASC 2006-HE1 | 1A | HSBC Bank | HSI Asset | HSBC Securities | 561,472,000.00 | 4.3.2006 | Group I |
| HASC 2006-HE2 | 1A | HSBC Bank | HSI Asset | HSBC Securities | 554,045,000.00 | 12.5.2006 | Group I |
| HASC 2006-NC1 | 1A | HSBC Bank | HSI Asset | HSBC Securities | 119,255,000.00 | 4.3.2006 | Group I |
| HASC 2006-OPT1 | 1A | HSBC Bank | HSI Asset | HSBC Securities | 265,058,000.00 | 2.3.2006 | Group I |
| HASC 2006-OPT2 | 1A | HSBC Bank | HSI Asset | HSBC Securities | 368,076,000.00 | 2.28.2006 | Group I |
| HASC 2006-OPT3 | 1A | HSBC Bank | HSI Asset | HSBC Securities | 143,680,000.00 | 5.12.2006 | Group I |
| | 1A | HSBC Bank | HSI Asset | HSBC Securities | 230,443,000.00 | 4.5.2006 | Group II |

| Transaction | Tranche | Sponsor | Depositor | Lead Underwriter | Principal Amount Issued ($) | Date of Issuance | Supporting Loan Group |
|---|---|---|---|---|---|---|---|
| HASC 2006-OPT4 | IX | HSBC Bank | HSI Asset | HSBC Securities | 264,847,000.00 | 4/28/2006 | Group I |
| HASC 2007-HE1 | IX | HSBC Bank | HSI Asset | HSBC Securities | 375,150,000.00 | 3/8/2007 | Group I |
| HASC 2007-HE2 | IX | HSBC Bank | HSI Asset | HSBC Securities | 326,874,000.00 | 5/4/2007 | Group I |
| HASC 2007-OPT1 | IX | HSBC Bank | HSI Asset | HSBC Securities | 456,767,000.00 | 1/16/2007 | Group I |
| HASC 2007-WF1 | IX | HSBC Bank | HSI Asset | HSBC Securities | 295,335,000.00 | 7/3/2007 | Group I |

## C. THE SECURITIZATION PROCESS
### 1. HSBC Bank Groups Mortgage Loans in Special Purpose Trusts

69. As the sponsor for the Securitizations, Defendant HSBC Bank purchased mortgage loans after the loans were originated, either directly from the originators or through affiliates of the originators. HSBC Bank then sold the mortgage loans to Defendant HSI Asset, the depositor. HSI Asset was a wholly owned, limited-purpose financial subsidiary of HSBC Markets and an affiliate of HSBC Bank. The sole purpose of HSI Asset was to act as a conduit through which loans acquired by HSBC Bank could be securitized and sold to investors.

70. For each of the Securitizations, HSBC Bank sold the relevant mortgage loans to HSI Asset pursuant to a Mortgage Loan Purchase Agreement, which contained various representations and warranties regarding the mortgage loans.

71. As part of each of the Securitizations, the trustee, on behalf of the Certificate holders, executed a Pooling and Servicing Agreement ("PSA") with the relevant depositor and the parties responsible for monitoring and servicing the mortgage loans in that Securitization. The trust, administered by the trustee, held the mortgage loans pursuant to the related PSA and issued Certificates, including the GSE Certificates, backed by such loans. The GSEs purchased the GSE Certificates, through which they obtained an ownership interest in the assets of the trust, including the mortgage loans.

### 2. The Trusts Issue Securities Backed by the Loans

72. Once the mortgage loans were transferred to the trusts in accordance with the PSAs, each trust issued Certificates backed by the underlying mortgage loans. The Certificates were then sold to investors like Fannie Mae and Freddie Mac, which thereby acquired an ownership interest in the assets of the corresponding trust. Each Certificate entitles its holder to a specified portion of the cashflows from the underlying mortgages in the

Supporting Loan Group.  The level of risk inherent in the Certificates was a function of the capital structure of the related transaction and the credit quality of the underlying mortgages.

73. The Certificates were issued pursuant to one of three Shelf Registration Statements, filed with the SEC on a Form S-3.  The Shelf Registration Statements were amended by one or more Forms S-3/A filed with the SEC.  The Individual Defendants each signed one or more of the Shelf Registration Statements (and/or one of the amendments) that were filed by HSI Asset.  The SEC filing number, registrant, signatories and filing dates for the Shelf Registration Statements and amendments thereto, as well as the Certificates covered by each Shelf Registration Statement, are set forth in Table 2 below.

74. On information and belief, the Kinney's Securitization involve the same set allegations as pertaining to the 17 Securitizations; Plaintiffs need to propound further discovery to identify the particulars pertaining to the Kinney's Securitizations.

Table 2

| SEC File No. | Date Registration Statement Filed | Date(s) Amended Registration Statement Filed | Registrant | Covered Certificates | Signatories of Registration Statement | Signatories of Amendments |
|---|---|---|---|---|---|---|
| 333-124032 | 4-13-2005 | 7-7-2005 | HSI Asset | FFML 2005-FF1<br>HASC 2005-I1<br>HASC 2005-NC1<br>HASC 2006-OPT1<br>HASC 2006-OPT2 | Neal Leonard, Gerard Mattia, Todd White, Norman Chaleff | Neal Leonard, Gerard Mattia, Todd White, Jon Voigtman |

| SEC File No. | Date Registration Statement Filed | Date(s) Amended Registration Statement Filed | Registrant | Covered Certificates | Signatories of Registration Statement | Signatories of Amendments |
|---|---|---|---|---|---|---|
| 333-131697 | 2-6-2006 | 3-9-2006<br>3-21-2006<br>3-28-2006 | HSI Asset | FFML 2006-FF5<br>FFML 2006-FF7 FFML 2006-FF9<br>FFML 2006-I-FI1<br>HASC 2006-HE1<br>HASC 2006-HE2<br>HASC 2006-OPT3<br>HASC 2006-OPT4<br>HASC 2007-HE1<br>HASC 2007-OPT1 | Neal Leonard, Gerard Mattia, Todd White, Jon Voigtman | Neal Leonard, Gerard Mattia, Todd White, Jon Voigtman |
| 333-140923 | 2-27-2007 | 3-27-2007 | HSI Asset | HASC 2007-HE2<br>HASC 2007-WF1 | Neal Leonard, Gerard Mattia, Todd White, Jon Voigtman | Neal Leonard, Gerard Mattia, Todd White |

75. The Prospectus Supplement for each Securitization describes the underwriting guidelines that purportedly were used in connection with the origination of the underlying mortgage loans. In addition, the Prospectus Supplements purport to provide accurate statistics regarding the mortgage loans in each group, including the ranges of and weighted average FICO credit scores of the borrowers, the ranges of and weighted average loan-to-value ratios of the loans, the ranges of and weighted average outstanding principal balances of the loans, the debt to-income ratios, the geographic distribution of the loans, the extent to which the loans were for purchase or refinance purposes; information concerning whether the loans were secured by a property to be used as a primary residence, second home, or investment property; and information concerning whether the loans were delinquent.

76. The Prospectus Supplements associated with each Securitization were filed with the SEC as part of the Registration Statements. The Form 8-Ks attaching the PSAs for each Securitization were also filed with the SEC. The date on which the Prospectus Supplement

and Form 8-K were filed for each Securitization, as well as the filing number of the Shelf Registration Statement related to each, are set forth in Table 3 below.

77. On information and belief, the Kinney's Securitization involve the same set allegations as pertaining to the 17 Securitizations; Plaintiffs need to propound further discovery to identify the particulars pertaining to the Kinney's Securitizations.

Table 3

| Transaction | Date Prospectus Supplement Filed | Date of Filing Form 8-K Attaching PSA | Filing No. of Related Registration Statement |
|---|---|---|---|
| FFML 2006-FF4 | 1 27 2006 | 2 9 2006 | 333-124032 |
| FFML 2006-FF5 | 5 5 2006 | 5 19 2006 | 333-131607 |
| FFML 2006-FF7 | 5 31 2006 | 6 14 2006 | 333-131607 |
| FFML 2006-FF9 | 7 16 2006 | N.A. | 333-131607 |
| FFML 2006-FF11 | 8 16 2006 | 9 14 2006 | 333-131607 |
| HASC 2005-I1 | 12 21 2005 | 1 4 2006 | 333-124032 |
| HASC 2006-HE1 | 11 3 2006 | 11 21 2006 | 333-131607 |
| HASC 2006-HE2 | 12 5 2006 | 1 5 2007 | 333-131607 |
| HASC 2006-NC1 | 3 8 2006 | 3 21 2006 | 333-124032 |
| HASC 2006-OPT1 | 2 7 2006 | 2 21 2006 | 333-124032 |
| HASC 2006-OPT2 | 3 1 2006 | 3 14 2006 | 333-124032 |
| HASC 2006-OPT3 | 4 5 2006 | 4 19 2006 | 333-131607 |
| HASC 2006-OPT4 | 5 3 2006 | 5 17 2006 | 333-131607 |
| HASC 2007-HE1 | 3 12 2007 | 3 22 2007 | 333-131607 |
| HASC 2007-HE2 | 5 7 2007 | 5 21 2007 | 333-140923 |
| HASC 2007-OPT1 | 1 31 2007 | 2 9 2007 | 333-131607 |
| HASC 2007-WF1 | 7 3 2007 | 7 18 2007 | 333-140923 |

78. The Certificates were issued pursuant to the PSAs, and Defendant HSBC Securities offered and sold the GSE Certificates to Fannie Mae and Freddie Mac pursuant to the Registration Statements, which, as noted previously, included the Prospectuses and Prospectus Supplements.

## II.   THE DEFENDANT'S PARTICIPATION IN THE SECURITIZATION PROCESS

### A. THE ROLE OF EACH OF THE HSBC DEFENDANTS

79. Each of the Defendants, including the Individual Defendants, had a role in the securitization process and the marketing of the Certificates, which included purchasing the mortgage loans from the originators, arranging the Securitizations, selling the mortgage loans to the depositor, transferring the mortgage loans to the trustee on behalf of the Certificateholders, underwriting the public offering of the Certificates, structuring and issuing the Certificates, and marketing and selling the Certificates to investors such as Fannie Mae and Freddie Mac.

80. With respect to each Securitization, the depositor, underwriter, and Individual Defendants who signed the Registration Statement, as well as the Defendants who exercised control over their activities, are liable, jointly and severally, as participants in the registration, issuance and offering of the Certificates, including issuing, causing, or making materially misleading statements in the Registration Statement, and omitting material facts required to be stated therein or necessary to make the statements contained therein not misleading.

### 1. HSBC BANK

81. Defendant HSBC Bank is the principal subsidiary of HSBC USA and a wholly owned subsidiary of HSBC North America. HSBC Bank acted as the sponsor of each of the 17 Securitizations. HSBC Bank also acted as the sponsor of the Kinney's Securitizations. In that capacity, HSBC Bank determined the structure of the Securitizations, initiated the Securitizations, purchased the mortgage loans to be securitized, determined distribution of principal and interest, and provided data to the credit rating agencies to secure investment grade ratings for the GSE Certificates. HSBC Bank also selected HSI Asset as the special purpose vehicle that would be used to transfer the mortgage loans from HSBC Bank to the trusts, and selected HSBC Securities as the lead underwriter for the Securitizations. In its role as sponsor, HSBC Bank knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing such loans would be issued by the relevant trusts.

82. Defendant HSBC Bank also conveyed the mortgage loans to HSI Asset pursuant to a Mortgage Loan Purchase Agreement. In this agreement, HSBC Bank made certain representations and warranties to HSI Asset regarding the groups of loans collateralizing the Certificates. These representations and warranties were assigned by HSI Asset to the trustees for the benefit of the Certificateholders.

### 2. HSI ASSET

83. HSI Asset is a direct, wholly owned subsidiary of HSBC Markets and a wholly owned subsidiary of HSBC North America. It is a special purpose entity formed solely for the purpose of purchasing mortgage loans, filing registration statements with the SEC, forming issuing trusts, assigning mortgage loans and all of its rights and interests in such mortgage loans to the trustee for the benefit of the certificateholders, and depositing the underlying mortgage loans into the issuing trusts.

84. In its capacity as depositor, HSI Asset purchased the mortgage loans from HSBC Bank pursuant to a Mortgage Loan Purchase Agreement. HSI Asset then sold, transferred, or otherwise conveyed the mortgage loans to be securitized to the trusts. HSI Asset, together with the other Defendants, was also responsible for preparing and filing the Registration Statements pursuant to which the Certificates were offered for sale. The trusts in turn held the mortgage loans for the benefit of the Certificateholders, and issued the Certificates in public offerings for sale to investors such as Fannie Mae and Freddie Mac.

### 3. HSBC SECURITIES

85. Defendant HSBC Securities is an investment bank, and was, at all relevant times, a registered broker-dealer and a major underwriter of mortgage- and other asset-backed securities in the United States. HSBC Securities is a direct, wholly owned subsidiary of HSBC Markets and a wholly owned subsidiary of HSBC North America.

86. Defendant HSBC Securities was the lead underwriter for each of the 17 Securitizations and the Kinney's Securitizations. In that role, it was responsible for underwriting and managing the offer and sale of the Certificates to Fannie Mae and Freddie Mac and other investors. HSBC Securities was also obligated to conduct meaningful due diligence to ensure that the Registration Statements did not contain any material misstatements or omissions, including as to the manner in which the underlying mortgage loans were originated, transferred, and underwritten.

### 4. HSBC USA

87. Defendant HSBC USA employed its wholly owned subsidiary HSBC Bank to serve as the sponsor for the Securitizations. As the corporate parent of HSBC Bank, HSBC USA had the practical ability to direct and control HSBC Bank's actions related to the Securitizations, and in fact exercised such direction and control over the activities of this entity related to the issuance and sale of the Certificates.

### 5. HSBC MARKETS

88. Defendant HSBC Markets employed its wholly owned subsidiaries, HSI Asset and HSBC Securities, in the key steps of the securitization process. Unlike typical arms' length securitizations, the Securitizations here involved the subsidiaries and affiliates of HSBC Markets at virtually each step in the chain—the sponsor was HSBC Bank, the depositor was HSI Asset, and the lead underwriter was HSBC Securities.

89. As the corporate parent of HSI Asset and HSBC Securities, HSBC Markets had the practical ability to direct and control these Defendants' actions related to the Securitizations, and in fact exercised such direction and control over the activities of these entities related to the issuance and sale of the Certificates.

### 6. HSBC NORTH AMERICA

90. Defendant HSBC North America wholly owns HSBC USA and HSBC Markets and is the ultimate US-based parent of HSBC Bank, HSI Asset, and HSBC Securities. As detailed, supra, the Securitizations here involved HSBC entities, including the aforementioned subsidiaries of HSBC North America, at virtually each step in the process. HSBC North America profited substantially from this vertically integrated approach to mortgage-backed securitization. Furthermore, HSBC North America shares, and, on information and belief, shared, overlapping management with the other Defendant entities. For example, Irene Dorner is President and Chief Executive Officer at HSBC Bank, President at HSBC USA, and is part of the senior management team at HSBC North America.

### 7. THE INDIVIDUAL DEFENDANTS

91. Defendant Neal Leonard was Chairman, Principal Executive Officer, and a Director of HSI Asset. In that capacity, Mr. Leonard signed Shelf Registration Statements applicable to all of the Securitizations and either signed or authorized another to sign the amendments to those Shelf Registration Statements.

92. Defendant Gerard Mattia was Treasurer, Principal Financial Officer, Principal Accounting Officer, and a Director of HSI Asset. In that capacity, Mr. Mattia signed Shelf Registration Statements applicable to all of the Securitizations and either signed or authorized another to sign the amendments to those Shelf Registration Statements.

93. Defendant Todd White was a Director of HSI Asset. In that capacity, Mr. White signed Shelf Registration Statements applicable to all of the Securitizations and either signed or authorized another to sign the amendments to those Shelf Registration Statements.

94. Defendant Norman Chaleff was a Director at HSI Asset. In that capacity, Mr. Chaleff signed one Shelf Registration Statement applicable to five of the Securitizations.

95. Defendant Jon Voigtman was Managing Director at both HSBC Securities and HSI Asset. In that capacity, Mr. Voigtman signed two Shelf Registration Statements applicable to twelve of the Securitizations, as well as the amendments to one of those Shelf Registration Statements, and the amendment to another Shelf Registration Statement applicable to five of the Securitizations.

### B. DEFENDANTS FAILURE TO CONDUCT PROPER DUE DILIGENCE

96. Defendants failed to conduct adequate and sufficient due diligence to ensure that the mortgage loans underlying the Securitizations complied with the representations in the Registration Statements.

97. HSBC Bank began securitizing residential mortgage loans in 2005 to take advantage of the rapidly expanding market for residential mortgage-backed securities. It securitized large volumes of mortgage loans acquired from various lenders in an effort to boost its fee revenue. In 2005, HSBC issued over half a billion dollars of subprime, residential mortgage-backed securities. By 2006, that number increased more than ten-fold to over $9.6 billion. HSBC's issuance of subprime, residential mortgage-backed securities remained high in 2007: over $6.7 billion.

98. Defendants had enormous financial incentives to complete as many offerings as quickly as possible without regard to ensuring the accuracy or completeness of the Registration Statements, or conducting adequate and reasonable due diligence. For example, HSI Asset, as the depositor, was paid a percentage of the total dollar amount of the offerings upon completion of the Securitizations, and HSBC Securities, as the underwriter, was paid a commission based on the amount it received from the sale of the Certificates to the public.

99. The push to securitize large volumes of mortgage loans contributed to the absence of controls needed to prevent the inclusion of untrue statements of material facts and

omissions of material facts in the Registration Statements. In particular, Defendants failed to conduct adequate diligence or to otherwise ensure the accuracy of the statements in the Registrations Statements pertaining to the Securitizations.

100. For instance, HSBC retained third-parties, including Clayton Holdings, Inc. ("Clayton"), to analyze the loans it was considering placing in its securitizations, but waived a significant number of loans into the Securitizations that these firms had recommended for exclusion, and did so without taking adequate steps to ensure that these loans had in fact been underwritten in accordance with applicable guidelines or had compensating factors that excused the loans' non-compliance with those guidelines. On January 27, 2008, Clayton revealed that it had entered into an agreement with the New York Attorney General (the "NYAG") to provide documents and testimony regarding its due diligence reports, including copies of the actual reports provided to its clients. According to The New York Times, as reported on January 27, 2008, Clayton told the NYAG "that starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending expectations" and "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."

101. HSBC was negligent in allowing into the Securitizations a substantial number of mortgage loans that, as reported to HSBC by third-party due diligence firms, did not conform to the underwriting standards stated in the Registration Statements, including the Prospectuses and Prospectus Supplements. Even upon learning from the third-party due diligence firms that there were high percentages of defective or at least questionable loans in the sample of loans reviewed by the third-party due diligence firms, HSBC failed to take any additional steps to verify that the population of loans in the Securitizations did not include a similar percentage of defective and/or questionable loans.

102. Clayton's trending reports revealed that in the period from the first quarter of 2006 to the second quarter of 2007, 27 percent of the mortgage loans HSBC submitted to Clayton to review in residential mortgage-backed securities groups were rejected by Clayton as falling outside the applicable underwriting guidelines. Of the mortgage loans that Clayton found defective, 62 percent of the loans were subsequently waived in by HSBC, without proper consideration and analysis of compensating factors, and included in securitizations such as the ones in which Fannie Mae and Freddie Mac invested here. See Clayton Trending Reports, available at http://fcic.law.stanford.edu/hearings/testimony/the-impact-of-the-financial-crisissacramento#documents.

103. HSBC has also come under the scrutiny of the SEC. As reported in HSBC USA's Form 10-Q for the period ending March 31, 2011, HSBC USA has received "three subpoenas from the SEC seeking production of documents and information relating to [its] involvement, and the involvement of [its] affiliates, in specified private-label residential mortgage-backed securities…transactions as an issuer, sponsor, underwriter, depositor, trustee or custodian as well as [its] involvement as a servicer. The first subpoena was received in December 2010, the second was received in February 2011 and the third was received in April 2011."

### III.    THE REGISTRATION STATEMENTS AND PROSPECTUS SUPPLEMENTS

### A. COMPLIANCE WITH UNDERWRITING GUIDELINES

104.  The Prospectus Supplement for each Securitization describe the mortgage loan underwriting guidelines pursuant to which the mortgage loans underlying the related Securitizations were to have been originated.  These guidelines were intended to assess the creditworthiness of the borrower, the ability of the borrower to repay the loan, and the adequacy of the mortgaged property as security for the loan.

105.  The statements made in the Prospectus Supplements, which, as discussed, formed part of the Registration Statement for each Securitization, were material to a reasonable investor's decision to purchase and invest in the Certificates because the failure to originate a mortgage loan in accordance with the applicable guidelines creates a higher risk of delinquency and default by the borrower, as well as a risk that losses upon liquidation will be higher, thus resulting in a greater economic risk to an investor.

106.  The Prospectus Supplements for the Securitizations contained several key statements with respect to the underwriting standards of the entities that originated the loans in the Securitizations.  For example, the Prospectus Supplement for the HASC 2006-OPT1 Securitization, for which Option One was the originator, HSBC Securities was the underwriter, and HSI Asset was the depositor, stated that the loans in the Securitization "will have been originated generally in accordance with Option One's Guidelines," and that "[t]he Option One Underwriting Guidelines are primarily intended to assess the value of the mortgaged property, to evaluate the adequacy of such property as collateral for the mortgage loan and to assess the applicant's ability to repay the mortgage loan."

107.  The HASC 2006-OPT1 Prospectus Supplement stated that "exceptions to the Option One Underwriting Guidelines" (including "a debt-to-income ratio exception, a pricing exception, a loan-to-value exception, a credit score exception or an exception from certain requirements of a particular risk category") are made on a "case-by-case basis," but emphasized that exceptions "are made where compensating factors exist."

108.  With respect to the information evaluated by Option One, the Prospectus Supplement stated that "[e]ach mortgage loan applicant completes an application that includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information.  The Option One Underwriting Guidelines require a credit report and, if available, a credit score on each applicant from a credit-reporting agency.  The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions or judgments."

109.  Additionally, the Prospectus Supplement stated that the "Option One Underwriting Guidelines require that mortgage loans be underwritten in a standardized procedure which complies with applicable federal and state laws and regulations and require Option One's underwriters to be satisfied that the value of the property being financed, as indicated by an appraisal, supports the loan balance."

110. The Prospectus and Prospectus Supplement for each of the Securitizations had similar representations to those quoted above. The relevant representations in the Prospectus and Prospectus Supplement pertaining to originating entity underwriting standards for each Securitization are set forth in Appendix A to this Complaint. As discussed infra at paragraphs 103 through 126, in fact, the originators of the mortgage loans in the Supporting Loan Group for the Securitizations did not adhere to their stated underwriting guidelines, thus rendering the description of those guidelines in the Prospectuses and Prospectus Supplements false and misleading.

111. Further, for the vast majority of the Securitizations, the Prospectuses and Prospectus Supplements described additional representations and warranties in the PSA concerning the mortgage loans backing the Securitizations, which were made by the originator. Such representations and warranties, which are described more fully for each Securitization in Appendix A, included: (i) the mortgage loans were underwritten in accordance with the originator's underwriting guidelines in effect at the time of origination, subject to only limited exceptions; and (ii) any and all requirements of any federal, state or local law applicable to the origination and servicing of the mortgage loans had been complied with.

112. The inclusion of these representations in the Prospectuses and Prospectus Supplements had the purpose and effect of providing additional assurances to investors regarding the quality of the mortgage collateral underlying the Securitizations and the compliance of that collateral with the underwriting guidelines described in the Prospectuses and Prospectus Supplements. These representations were material to a reasonable investor's decision to purchase the Certificates.

### B. STATEMENTS REGARDING OCCUPANCY STATUS OF BORROWER

113. The Prospectus Supplements contained collateral group-level information about the occupancy status of the borrowers of the loans in the Securitizations. Occupancy status refers to whether the property securing a mortgage is to be the primary residence of the borrower, a second home, or an investment property. The Prospectus Supplement for each of the Securitizations presented this information in tabular form, usually in a table entitled "Occupancy Status of the Mortgage Loans." This table divided all the loans in each collateral group by occupancy status, generally into the following categories: (i) "Primary," or "Owner Occupied;" (ii) "Second Home," or "Secondary"; and (iii) "Investment" or "Non-Owner." For each category, the table stated the number of loans in that category. Occupancy statistics for the Supporting Loan Groups for each Securitization were reported in the Prospectus Supplements as follows:[4]

---

[4] Each Prospectus Supplement provides the total number of loans and the number of loans in the following categories: owner occupied, second home, and investor. These numbers have been converted to percentages.

Table 4

| Transaction | Supporting Loan Group | Primary or Owner Occupied | Second Home/Secondary | Investor |
|---|---|---|---|---|
| FFML 2006-FF1 | Group 1 | 91.47 | 0.82 | 7.71 |
| FFML 2006-FF5 | Group 1 | 94.06 | 1.02 | 4.92 |
| FFML 2006-FF7 | Group 1 | 95.08 | 0.74 | 4.17 |
| FFML 2006-FF9 | Group 1 | 95.61 | 0.84 | 5.56 |
| FFML 2006-FF11 | Group 1 | 98.29 | 0.23 | 1.48 |
| HASC 2006-4I | Group 1 | 94.47 | 3.93 | 1.60 |
| HASC 2006-HE1 | Group 1 | 95.51 | 1.64 | 2.85 |
| HASC 2006-HE2 | Group 1 | 95.68 | 1.91 | 2.41 |
| HASC 2006-NC1 | Group 1 | 94.05 | 5.79 | 0.16 |
| HASC 2006-OPT1 | Group 1 | 88.88 | 2.18 | 8.94 |
| HASC 2006-OPT2 | Group 1 | 92.19 | 1.46 | 6.35 |
| HASC 2006-OPT3 | Group 1 | 98.51 | 0.60 | 1.49 |
|  | Group B | 87.17 | 2.15 | 10.68 |
| HASC 2006-OPT4 | Group 1 | 96.49 | 1.03 | 2.48 |
| HASC 2007-HE1 | Group 1 | 90.27 | 1.24 | 8.49 |
| HASC 2007-HE2 | Group 1 | 95.76 | 0.89 | 3.35 |
| HASC 2007-OPT1 | Group 1 | 92.47 | 0.76 | 6.77 |
| HASC 2007-WF1 | Group 1 | 92.31 | 1.79 | 5.90 |

114. On information and belief, the Kinney's Securitization involve the same set allegations as pertaining to the 17 Securitizations; Plaintiffs need to propound further discovery to identify the particulars pertaining to the Kinney's Securitizations.

115. As Table 4 makes clear, the Prospectus Supplements for each Securitization reported that an overwhelming majority of the mortgage loans in the Supporting Loan Groups were owner occupied, while a small percentage were reported to be non-owner occupied (i.e., a second home or investment property).

116. The statements about occupancy status were material to a reasonable investor's decision to invest in the Certificates. Information about occupancy status is an important factor in determining the credit risk associated with a mortgage loan and, therefore, the securitization that it collateralizes. Because borrowers who reside in mortgaged properties are less likely to default than borrowers who purchase homes as second homes or investments and live elsewhere, and are more likely to care for their primary residence, the percentage of loans in the collateral group of a securitization that are secured by mortgage loans on owner-occupied residences is an important measure of the risk of the certificates sold in that securitization. As stated in most of the Registration Statements, "Mortgage Loans secured by properties acquired by investors for the purposes of rental income or capital appreciation, or properties acquired as second homes, tend to have higher severities of default than properties that are regularly occupied by the related borrowers." See, e.g., FFML 2006-FF5 Prospectus Supplement, filed May 8, 2006.

117. Other things being equal, the higher the percentage of loans not secured by owner-occupied residences, the greater the risk of loss to the certificateholders. Even small differences in the percentages of primary/owner-occupied, second home/secondary, and investment properties in the collateral group of a securitization can have a significant effect on the risk of each certificate sold in that securitization, and, thus, are important to the

decision of a reasonable investor whether to purchase any such certificate. As discussed infra at paragraphs 93 through 96, the Registration Statement for each Securitization materially overstated the percentage of loans in the Supporting Loan Groups that were owner occupied, thereby misrepresenting the degree of risk of the GSE Certificates.

### C. STATEMENTS REGARDING LOAN-TO-VALUE RATIOS

118. The loan-to-value ratio of a mortgage loan, or LTV ratio, is the ratio of the balance of the mortgage loan to the value of the mortgaged property when the loan is made.

119. The denominator in the LTV ratio is the value of the mortgaged property, and is generally the lower of the purchase price or the appraised value of the property. In a refinancing or home-equity loan, there is no purchase price to use as the denominator, so the denominator is often equal to the appraised value at the time of the origination of the refinanced loan. Accordingly, an accurate appraisal is essential to an accurate LTV ratio. In particular, an inflated appraisal will understate, sometimes greatly, the credit risk associated with a given loan.

120. The Prospectus Supplements for each Securitization also contained group-level information about the LTV ratio for the underlying group of loans as a whole. The percentage of loans with an LTV ratio at or less than 80 percent and the percentage of loans with an LTV ratio greater than 100 percent as reported in the Prospectus Supplements for the Supporting Loan Groups are set forth in Table 5 below.[5]

---

[5] As used in this Complaint, "LTV" refers to the original loan-to-value ratio for first lien mortgages and for properties with second liens that are subordinate to the lien that was included in the securitization (i.e., only the securitized lien is included in the numerator of the LTV calculation). However, for second lien mortgages, where the securitized lien is junior to another loan, the more senior lien has been added to the securitized one to determine the numerator in the LTV calculation (this latter calculation is sometimes referred to as the combined-loan-to-value ratio, or "CLTV").

Table 5

| Transaction | Supporting Loan Group | Percentage of loans, by aggregate principal balance, with LTV less than or equal to 80% | Percentage of loans, by aggregate principal balance, with LTV greater than 100% |
|---|---|---|---|
| FFML 2006-FF11 | Group I | 72.16 | 0.00 |
| FFML 2006-FF5 | Group I | 60.92 | 0.10 |
| FFML 2006-FF7 | Group I | 70.80 | 0.00 |
| FFML 2006-FF9 | Group I | 62.94 | 0.15 |
| FFML 2006-FF11 | Group I | 66.43 | 0.04 |
| HASC 2005-H | Group I | 53.16 | 0.00 |
| HASC 2006-HE1 | Group I | 33.56 | 0.00 |
| HASC 2006-HE2 | Group I | 72.49 | 0.00 |
| HASC 2006-NC1 | Group I | 56.86 | 0.00 |
| HASC 2006-OPT1 | Group I | 49.30 | 0.00 |
| HASC 2006-OPT2 | Group I | 52.56 | 0.00 |
| HASC 2006-OPT3 | Group I | 67.53 | 0.00 |
| | Group II | 57.90 | 0.00 |
| HASC 2006-OPT4 | Group I | 66.04 | 0.00 |
| HASC 2007-HE1 | Group I | 38.50 | 0.03 |
| HASC 2007-HE2 | Group I | 25.63 | 0.02 |
| HASC 2007-OPT1 | Group I | 15.16 | 0.00 |
| HASC 2007-WF1 | Group I | 36.20 | 0.00 |

121. On information and belief, the Kinney's Securitization involve the same set allegations as pertaining to the 17 Securitizations; Plaintiffs need to propound further discovery to identify the particulars pertaining to the Kinney's Securitizations.

122. As Table 5 makes clear, the Prospectus Supplements for most Securitizations reported that the majority of mortgage loans in the Supporting Loan Groups had an LTV ratio of 80 percent or less,[6] and the Prospectus Supplements for nearly all of the Securitizations reported that zero mortgage loans in the Supporting Loan Group had an LTV ratio over 100 percent.

123. The LTV ratio is among the most important measures of the risk of a mortgage loan, and, thus, it is one of the most important indicators of the default risk of the mortgage loans underlying the Certificates. The lower the ratio, the less likely that a decline in the value of the property will wipe out an owner's equity, and thereby give an owner an incentive to stop making mortgage payments and abandon the property. This ratio also predicts the severity of loss in the event of default. The lower the LTV ratio, the greater the "equity cushion," so the greater the likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

---

[6] The exceptions are HASC 2006-HE1, HASC 2006-OPT1, HASC 2007-HE1, HASC 2007-HE2, HASC 2007-OPT1, and HASC 2007-WF1, for which more than half of the mortgage loans by aggregate balance were reported as having an LTV ratio greater than 80 percent and below 100 percent.

insurance companies, and university endowments have relied heavily on credit ratings to assist them in distinguishing between safe and risky investments. Fannie Mae's and Freddie Mac's respective internal policies limited their purchases of private label residential mortgage-backed securities to those rated AAA (or its equivalent), and in very limited instances, AA or A bonds (or their equivalent).

128. Each tranche of the Securitizations received a credit rating upon issuance, which purported to describe the riskiness of that tranche. The Defendants reported the credit ratings for each tranche in the Prospectus Supplements. The credit rating provided for each of the GSE Certificates was "investment grade," almost always AAA or its equivalent. The accuracy of these ratings was material to a reasonable investor's decision to purchase the GSE Certificates. As set forth in Table 8, infra at paragraph 163, the ratings for the Securitizations were inflated as a result of Defendants' provision of incorrect data concerning the attributes of the underlying mortgage collateral to the ratings agencies, and, as a result, Defendants sold and marketed the GSE Certificates as AAA (or its equivalent) when, in fact, they were not.

## IV.    FALSITY OF STATEMENTS IN THE REGISTRATION STATEMENTS AND PROSPECTUS SUPPLEMENTS

### A. The Statistical Data Provided in the Prospectus Supplements Concerning Owner Occupancy and LTV Ratios Was Materially False

129. A review of loan-level data was conducted in order to assess whether the statistical information provided in the Prospectus Supplements was true and accurate. For each Securitization, the sample consisted of 1,000 randomly selected loans per Supporting Loan Group, or all of the loans in the group if there were fewer than 1,000 loans in the Supporting Loan Group. The sample data confirms, on a statistically significant basis, material misrepresentations of underwriting standards and of certain key characteristics of the mortgage loans across the Securitizations. The data review demonstrates that the data concerning owner occupancy and LTV ratios was materially false and misleading.

### 1.  OWNER OCCUPANCY STATUS WAS MATERIALLY FALSE

130. The data review has revealed that the owner occupancy statistics reported in the Prospectus Supplements were materially false and inflated. In fact, far fewer underlying properties were occupied by their owners than disclosed in the Prospectus Supplements, and more correspondingly were held as second homes or investment properties.

131. To determine whether a given borrower actually occupied the property as claimed, a number of tests were conducted, including, inter alia, whether, months after the loan closed, the borrower's tax bill was being mailed to the property or to a different address; whether the borrower had claimed a tax exemption on the property; and whether the mailing address of the property was reflected in the borrower's credit reports, tax records, or lien records. Failing two or more of these tests is a strong indication that the borrower did not live at the mortgaged property and instead used it as a second home or an investment property, both of which make it much more likely that a borrower will not repay the loan.

124. Thus, LTV ratio is a material consideration to a reasonable investor in deciding whether to purchase a certificate in a securitization of mortgage loans. Even small differences in the LTV ratios of the mortgage loans in the collateral group of a securitization have a significant effect on the likelihood that the collateral groups will generate sufficient funds to pay certificateholders in that securitization, and thus are material to the decision of a reasonable investor whether to purchase any such certificate. As discussed infra at paragraphs 97 through 102, the Registration Statements for the Securitizations materially overstated the percentage of loans in the Supporting Loan Groups with an LTV ratio at or less than 80 percent, and materially understated the percentage of loans in the Supporting Loan Groups with an LTV ratio over 100 percent, thereby misrepresenting the degree of risk of the GSE Certificates.

### D. STATEMENTS REGARDING CREDIT RATINGS

125. Credit ratings are assigned to the tranches of mortgage-backed securitizations by the credit rating agencies, including Moody's Investors Service, Standard & Poor's, and Fitch Ratings. Each credit rating agency uses its own scale with letter designations to describe various levels of risk. In general, AAA or its equivalent ratings are at the top of the credit rating scale and are intended to designate the safest investments. C and D ratings are at the bottom of the scale and refer to investments that are currently in default and exhibit little or no prospect for recovery. At the time the GSEs purchased the GSE Certificates, investments with AAA or its equivalent ratings historically experienced a loss rate of less than .05 percent. Investments with a BBB rating, or its equivalent, historically experienced a loss rate of less than one percent. As a result, securities with credit ratings between AAA through BBB- or their equivalents were generally referred to as "investment grade."

126. Rating agencies determine the credit rating for each tranche of a mortgage-backed securitization by comparing the likelihood of contractual principal and interest repayment to the "credit enhancements" available to protect investors. Rating agencies determine the likelihood of repayment by estimating cashflows based on the quality of the underlying mortgages by using sponsor-provided loan level data. Credit enhancements, such as subordination, represent the amount of "cushion" or protection from loss incorporated into a given securitization.[7] This cushion is intended to improve the likelihood that holders of highly rated certificates receive the interest and principal to which they are contractually entitled. The level of credit enhancement offered is based on the make-up of the loans in the underlying collateral group and entire securitization. Riskier loans underlying the securitization necessitate higher levels of credit enhancement to insure payment to senior certificate holders. If the collateral within the deal is of a higher quality, then rating agencies require less credit enhancement for AAA or its equivalent rating.

127. Credit ratings have been an important tool to gauge risk when making investment decisions. For almost a hundred years, investors like pension funds, municipalities,

---

[7] "Subordination" refers to the fact that the certificates for a mortgage-backed securitization are issued in a hierarchical structure, from senior to junior. The junior certificates are "subordinate" to the senior certificates in that, should the underlying mortgage loans become delinquent or default, the junior certificates suffer losses first. These subordinate certificates thus provide a degree of protection to the senior certificates from losses on the underlying loans.

132. A significant number of the loans failed two or more of these tests, indicating that the owner occupancy statistics provided to Fannie Mae and Freddie Mac were materially false and misleading. For example, for Supporting Loan Group I in the HASC 2006-OPT3 Securitization, which was sponsored by HSBC Bank and underwritten by HSBC Securities, the Prospectus Supplement stated that 1.49 percent of the underlying properties by loan count in the Supporting Loan Group were not owner-occupied. But the data review revealed that, for 9.74 percent of the properties represented as owner-occupied, the owners lived elsewhere, indicating that the true percentage of non-owner occupied properties was 11.09 percent, more than seven times the percentage reported in the Prospectus Supplement.[8]

133. The data review revealed that, for each Securitization, the Prospectus Supplement misrepresented the percentage of non-owner occupied properties. The true percentage of non-owner occupied properties, as determined by the data review, versus the percentage stated in the Prospectus Supplement for each Securitization is reflected in Table 6 below. Table 6 demonstrates that the Prospectus Supplements for each Securitization understated the percentage of non-owner occupied properties by at least 8 percent, and for many Securitizations by 10 percent or more.

134. On information and belief, the Kinney's Securitization involve the same set allegations as pertaining to the 17 Securitizations; Plaintiffs need to propound further discovery to identify the particulars pertaining to the Kinney's Securitizations.

---

[8] This conclusion is arrived at by summing (a) the stated non-owner-occupied percentage in the Prospectus Supplement (here, 1.49 percent), and (b) the product of (i) the stated owner-occupied percentage (here, 98.51 percent) and (ii) the percentage of the properties represented as owner-occupied in the sample that showed strong indications that their owners in fact lived elsewhere (here, 9.74 percent).

Table 6

| Transaction | Supporting Loan Group | Reported Percentage of Non-Owner Occupied Properties | Percentage of Properties Reported as Owner-Occupied With Strong Indication of Non-Owner Occupancy[9] | Actual Percentage of Non-Owner Occupied Properties | Prospectus Percentage Understatement of Non-Owner Occupied Properties |
|---|---|---|---|---|---|
| FFML 2006-FF13 | Group I | 8.83 | 12.02 | 19.53 | 11.00 |
| FFML 2006-FF5 | Group I | 8.94 | 10.51 | 18.83 | 9.89 |
| FFML 2006-FF7 | Group I | 4.92 | 10.77 | 15.15 | 10.23 |
| FFML 2006-FF9 | Group I | 6.39 | 12.49 | 18.08 | 11.69 |
| FFML 2006-FF14 | Group I | 1.71 | 10.25 | 11.79 | 10.08 |
| HASC 2005-I1 | Group I | 5.93 | 13.75 | 18.52 | 12.99 |
| HASC 2006-HE1 | Group I | 4.44 | 14.58 | 15.55 | 11.06 |
| HASC 2006-HE2 | Group I | 4.32 | 16.97 | 14.81 | 10.49 |
| HASC 2006-NC1 | Group I | 5.98 | 14.10 | 19.21 | 13.26 |
| HASC 2006-OPT1 | Group I | 11.12 | 10.77 | 20.69 | 9.57 |
| HASC 2006-OPT2 | Group I | 7.81 | 9.24 | 16.35 | 8.52 |
| HASC 2006-OPT3 | Group I | 1.49 | 9.71 | 11.09 | 9.60 |
| HASC 2006-OPT3 | Group II | 12.83 | 11.63 | 22.98 | 10.13 |
| HASC 2006-OPT4 | Group I | 5.51 | 11.05 | 14.16 | 10.65 |
| HASC 2007-HE1 | Group I | 9.73 | 10.53 | 19.23 | 9.50 |
| HASC 2007-HE2 | Group I | 4.24 | 11.41 | 18.17 | 16.93 |
| HASC 2007-OPT1 | Group I | 7.53 | 9.13 | 16.26 | 8.73 |
| HASC 2007-WF1 | Group I | 7.69 | 11.73 | 18.52 | 10.83 |

(SEE TABLE 6)[9]

## 2. Loan-to-Value Data Was Materially False

135. The data review has further revealed that the LTV ratios disclosed in the Prospectus Supplements were materially false and understated, as more specifically set out below. For each of the sampled loans, an industry standard automated valuation model ("AVM") was used to calculate the value of the underlying property at the time the mortgage loan was originated. AVMs are routinely used in the industry as a way of valuing properties during prequalification, origination, portfolio review and servicing. AVMs rely upon similar data as appraisers—primarily county assessor records, tax rolls, and data on comparable properties. AVMs produce independent, statistically-derived valuation estimates by applying modeling techniques to this data.

136. Applying the AVM to the available data for the properties securing the sampled loans shows that the appraised value given to such properties was significantly higher than the actual value of such properties. The result of this overstatement of property values is a material understatement of LTV. That is, if a property's true value is significantly less than the value used in the loan underwriting, then the loan represents a significantly higher percentage of the property's value. This, of course, increases the risk a borrower will not repay the loan and the risk of greater losses in the event of a default. As stated in the

---

[9] As described more fully in paragraph 131, failing two or more tests of owner-occupancy is a strong indication that the borrower did not live at the mortgaged property and instead used it as a second home or an investment property.

Prospectus Supplement for HASC 2006-OPT1: "Mortgage loans with higher loan-to-value ratios may present a greater risk of loss than mortgage loans with loan-to-value ratios of 80% or below."

137. For example, for the FFML 2006-FF7 Securitization, which was sponsored by HSBC Bank and underwritten by HSBC Securities, the Prospectus Supplement stated that no LTV ratios for the Supporting Loan Group were above 100 percent. In fact, 16.57 percent of the sample of loans included in the data review had LTV ratios above 100 percent. In addition, the Prospectus Supplement stated that 70.80 percent of the loans had LTV ratios at or below 80 percent. The data review indicated that only 39.50 percent of the loans had LTV ratios at or below 80 percent.

138. The data review revealed that, for each Securitization, the Prospectus Supplement misrepresented the percentage of loans with an LTV ratio above 100 percent, as well the percentage of loans that had an LTV ratio at or below 80 percent. Table 7 reflects (i) the true percentage of mortgages in each Supporting Loan Group with LTV ratios above 100 percent, versus the percentage reported in the Prospectus Supplement; and (ii) the true percentage of mortgages in each Supporting Loan Group with LTV ratios at or below 80 percent, versus the percentage reported in the Prospectus Supplement. The percentages listed in Table 7 were calculated by aggregated principal balance.

139. On information and belief, the Kinney's Securitization involve the same set allegations as pertaining to the 17 Securitizations; Plaintiffs need to propound further discovery to identify the particulars pertaining to the Kinney's Securitizations.

Table 7

| Transaction | Supporting Loan Group | PROSPECTUS Percentage of Loans Reported to Have LTV Ratio At or Less Than 80% | DATA REVIEW True Percentage of Loans With LTV Ratio At or Less Than 80% | PROSPECTUS Percentage of Loans Reported to Have LTV Ratio Over 100% | DATA REVIEW True Percentage of Loans With LTV Ratio Over 100% |
|---|---|---|---|---|---|
| FFML 2006-FF1 | Group 1 | 72.46 | 48.64 | 0.00 | 9.41 |
| FFML 2006-FF8 | Group 1 | 60.42 | 48.55 | 0.10 | 14.91 |
| FFML 2006-FF7 | Group 1 | 20.50 | 19.50 | 0.00 | 16.52 |
| FFML 2006-FF9 | Group 1 | 62.94 | 44.05 | 0.15 | 11.87 |
| FFML 2006-FF11 | Group 1 | 66.13 | 42.42 | 0.04 | 13.45 |
| HASC 2005-I1 | Group 1 | 51.16 | 43.58 | 0.00 | 17.51 |
| HASC 2006-HE1 | Group 1 | 51.16 | 26.61 | 0.00 | 50.42 |
| HASC 2006-HE2 | Group 1 | 72.49 | 42.87 | 0.00 | 14.99 |
| HASC 2006-NC1 | Group 1 | 56.50 | 35.57 | 0.00 | 14.12 |
| HASC 2006-OPT1 | Group 1 | 49.50 | 16.63 | 0.00 | 17.95 |
| HASC 2006-OPT2 | Group 1 | 42.56 | 12.14 | 0.06 | 18.46 |
| HASC 2006-OPT3 | Group 1 | 67.13 | 53.64 | 0.00 | 11.66 |
| | Group II | 57.90 | 42.05 | 0.00 | 17.11 |
| HASC 2006-OPT4 | Group 1 | 66.04 | 46.95 | 0.00 | 16.08 |
| HASC 2007-HE1 | Group 1 | 43.91 | 25.17 | 0.00 | 25.13 |
| HASC 2007-HE2 | Group 1 | 25.03 | 15.17 | 0.00 | 39.51 |
| HASC 2007-OPT1 | Group 1 | 45.60 | 32.27 | 0.00 | 21.94 |
| HASC 2007-WF1 | Group 1 | 50.26 | 23.31 | 0.00 | 24.71 |

140. As Table 7 demonstrates, the Prospectus Supplements for all but three of the Securitizations reported that none of the mortgage loans in the Supporting Loan Groups had an LTV ratio over 100. With respect to those three exceptions, the percentage of mortgage loans with a reported LTV ratio over 100 percent was extremely small—under 0.15 percent in all instances. In contrast, the data review revealed that for all of the Supporting Loan Groups in the Securitizations, at least 9.41 percent of the mortgage loans had an actual LTV ratio over 100 percent, and for most Securitizations this figure was much larger. Indeed, for 16 of the Securitizations, the data review revealed that more than 10 percent of the mortgages in the Supporting Loan Group had a true LTV ratio over 100 percent. For five of the Securitizations, the data review revealed that more than 20 percent of the mortgages in the Supporting Loan Group had a true LTV ratio over 100 percent.

141. These inaccuracies with respect to reported LTV ratios also indicate that the representations in the Registration Statements relating to appraisal practices were false, and that the appraisers themselves, in many instances, furnished appraisals that they understood were inaccurate and that they knew bore no reasonable relationship to the actual value of the underlying properties. Indeed, independent appraisers following proper practices, and providing genuine estimates as to valuation, would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties. This conclusion is further confirmed by the findings of the Financial Crisis Inquiry Commission (the "FCIC"), which identified "inflated appraisals" as a pervasive problem during the period of the Securitizations, and determined through its investigation that appraisers were often pressured by mortgage originators, among others, to produce inflated results. See FCIC, Final Report of the National Commission on the

Causes of the Financial and Economic Crisis in the United States (January 2011) ("FCIC Report") at 91-92.

### B. The Originators of the Underlying Mortgage Loans Systematically Disregarded Their Underwriting Guidelines

142.  The Registration Statements contained material misstatements and omissions regarding compliance with underwriting guidelines.  Indeed, the originators for the loans underlying the Securitizations systematically disregarded their respective underwriting guidelines in order to increase production and profits derived from their mortgage lending businesses. This is confirmed by the systematically misreported owner occupancy and LTV statistics, discussed supra, and by (1) government investigations into originators' underwriting practices, which have revealed widespread abandonment of originators' reported underwriting guidelines during the relevant period; (2) the collapse of the Certificates' credit ratings; and (3) the surge in delinquency and default in the mortgage loans in the Securitizations.

#### 1.   Government Investigations Have Confirmed That the Originators of the Loans in the Securitizations Systematically Failed to Adhere to Their Underwriting Guidelines

143.  The abandonment of underwriting guidelines is confirmed by several government reports and investigations that have described rampant underwriting failures throughout the period of the Securitizations and, more specifically, underwriting failures by the very originators whose loans were included by the Defendants in the Securitizations.

144.  For instance, in November 2008, the Office of the Comptroller of the Currency ("OCC"), an office within the United States Department of the Treasury, issued a report identifying the "Worst Ten" mortgage originators in the "Worst Ten" metropolitan areas.  The worst originators were defined as those with the largest number of non-prime mortgage foreclosures for 2005-2007 originations.  Option One, Countrywide, WMC, and New Century, which originated many of the loans for the Securitizations at issue here, were all on that list.  See Office of the Comptroller of the Currency Press Release, "Worst Ten in the Worst Ten," Nov. 13, 2008.

145.  Option One originated all of the mortgage loans in the Supporting Loan Groups in the HASC 2005-I1, HASC 2006-OPT1, HASC 2006-OPT2, HASC 2006-OPT3, HASC 2006 OPT4, HASC 2007-OPT1, and HASC 2007-WF1 Securitizations.  On June 3, 2008, the Attorney General for the Commonwealth of Massachusetts filed an action against Option One (the "Option One Complaint"), and its past and present parent companies, for their unfair and deceptive origination and servicing of mortgage loans.  See Complaint, Commonwealth v. H&R Block, Inc., CV NO. 08-2474-BLS (Mass. Super. Ct. June 3, 2008).  According to the Massachusetts Attorney General, since 2004, Option One had "increasingly disregarded underwriting standards ... and originated thousands of loans that [Option One] knew or should have known the borrowers would be unable to pay, all in an effort to increase loan origination volume so as to profit from the practice of packaging and selling the vast majority of [Option One's] residential subprime loans to the secondary market."  See Option One Complaint.  The Massachusetts Attorney General alleged that

Option One's agents and brokers "frequently overstated an applicant's income and/or ability to pay, and inflated the appraised value of the applicant's home," and that Option One "avoided implementing reasonable measures that would have prevented or limited these fraudulent practices." Option One's "origination policies … employed from 2004 through 2007 have resulted in an explosion of foreclosures." Id. at 1. On November 24, 2008, the Superior Court of Massachusetts granted a preliminary injunction that prevented Option One from foreclosing on thousands of its loans issued to Massachusetts residents. Commonwealth v. H&R Block, Inc., No. 08-2474-BLS1, 2008 WL 5970550 (Mass. Super. Ct. Nov. 24, 2008). On October 29, 2009, the Appeals Court of Massachusetts affirmed the preliminary injunction. See Commonwealth v. Option One Mortgage Co., No. 09-P-134, 2009 WL 3460373 (Mass. App. Ct. Oct. 29, 2009).

146. On August 9, 2011, the Massachusetts Attorney General announced that H&R Block, Inc., Option One's parent company, had agreed to settle the suit for approximately $125 million. See Massachusetts Attorney General Press Release, "H&R Block Mortgage Company Will Provide $125 Million in Loan Modifications and Restitutions," Aug. 9, 2011. Media reports noted that the suit was being settled amidst ongoing discussions among multiple states' attorneys general, federal authorities, and five major mortgage servicers, aimed at resolving investigations of the lenders' foreclosure and mortgage-servicing practices. The Massachusetts Attorney General released a statement saying that no settlement should include a release for conduct relating to the lenders' packaging of mortgages into securitizations. See, e.g., Bloomberg.com, "H&R Block, Massachusetts Reach $125 Million Accord in State Mortgage Suit," Aug. 9, 2011.

147. Countrywide originated 40.68 percent and 29.48 percent of the loans in the Supporting Loan Groups in the HASC 2006-HE1 and HASC 2006-HE2 Securitizations, respectively. In January 2011, the FCIC issued its final report, which detailed, among other things, the collapse of mortgage underwriting standards and subsequent collapse of the mortgage market and wider economy. The FCIC Report singled out Countrywide for its role: Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences." Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm. But they did not stop.
FCIC Report at xxii.

148. Countrywide has also been the subject of several investigations and actions concerning its lax and deficient underwriting practices. In June 2009, for instance, the SEC initiated a civil action against Countrywide executives Angelo Mozilo (founder and Chief Executive Officer), David Sambol (Chief Operating Officer), and Eric Sieracki (Chief Financial Officer) for securities fraud and insider trading. In a September 16, 2010 opinion denying these defendants' motions for summary judgment, the United States District Court for the Central District of California found that the SEC raised genuine issues of fact as to, among other things, whether the defendants had misrepresented the quality of Countrywide's underwriting processes. The court noted that the SEC presented evidence that Countrywide

"routinely ignored its official underwriting to such an extent that Countrywide would underwrite any loan it could sell into the secondary mortgage market," and that "a significant portion (typically in excess of 20%) of Countrywide's loans were issued as exceptions to its official underwriting guidelines ...." The court concluded that "a reasonable jury could conclude that Countrywide all but abandoned managing credit risk through its underwriting guidelines ...." S.E.C. v. Mozilo, No. CV 09-3994, 2010 WL 3656068, at *10 (C.D. Cal. Sept. 16, 2010). Mozilo, Sambol, and Sieracki subsequently settled with the SEC.

149. The testimony and documents only recently made available to the GSEs by way of the SEC's investigation confirm that Countrywide was systematically abusing "exceptions" and low-documentation processes in order to circumvent its own underwriting standards. For example, in an April 13, 2006 e-mail, Mozilo wrote to Sieracki and others that he was concerned that certain subprime loans had been originated "with serious disregard for process [and] compliance with guidelines," resulting in the delivery of loans "with deficient documentation." Mozilo further stated that "I have personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]."

150. WMC originated 58.74 percent, 58.29 percent, and 26.05 percent of the loans in the Supporting Loan Groups in the HASC 2006-HE1, HASC 2006-HE2, and HASC 2007-HE2 Securitizations, respectively. WMC employed reckless underwriting standards and practices, as described more fully below, that resulted in a huge number of foreclosures, ranking WMC fourth in the report presented to the FCIC in April 2010 identifying the "Worst Ten" mortgage originators in the "Worst Ten" metropolitan areas. See OCC Press Release, "Worst Ten in the Worst Ten." General Electric, which had purchased WMC in 2004, closed down operations at WMC in late 2007 and took a $1.4 billion charge in the third quarter of that year. See, e.g., Diane Brady, "Adventures of a Subprime Survivor," Bloomberg Businessweek, Oct. 29, 2007 (available at http://www.businessweek.com/magazine/ content/07_44/b4056074.htm).

151. WMC's reckless loan originating practices were noticed by regulatory authorities. In June 2008, the Washington State Department of Financial Institutions, Division of Consumer Services filed a Statement of Charges and Notice of Intention to Enter an Order to Revoke License, Prohibit From Industry, Impose Fine, Order Restitution and Collect Investigation Fees (the "Statement of Charges") against WMC Mortgage and its principal owners individually. See Statement of Charges, No. C-07-557-08-SC01, Jun. 4, 2008. The Statement of Charges included 86 loan files, which revealed that at least 76 loans were defective or otherwise in violation of Washington state law. Id. Among other things, the investigation uncovered that WMC had originated loans with unlicensed or unregistered mortgage brokers, understated amounts of finance charges on loans, understated amounts of payments made to escrow companies, understated annual percentage rates to borrowers and committed many other violations of Washington State deceptive and unfair practices laws. Id.

152. New Century originated 34.51 percent and 100 percent of the loans in the Supporting
Loan Groups in the HASC 2005-I1 and HASC 2006-NC1 Securitizations, respectively. As
stated in the Prospectus Supplement for the HASC 2006-NC1 Securitization, "[f]or the
quarter ending September 30, 2005, New Century Financial Corporation originated $40.4
billion in mortgage loans." And before its collapse in the first half of 2007, New Century
was one of the largest subprime lenders in the country.

153. In 2010, the OCC identified New Century as the worst subprime lender in the country
based on the delinquency rates of the mortgages it originated in the ten metropolitan areas
between 2005 and 2007 with the highest rates of delinquency. See OCC Press Release,
"Worst Ten in the Worst Ten: Update," Mar. 22, 2010. Further, in January 2011, the FCIC
issued its final report and, as it did with Countrywide, singled out New Century for its role:
New Century—once the nation's second-largest subprime lender—ignored early warnings
that its own loan quality was deteriorating and stripped power from two risk-control
departments that had noted the evidence. In a June 2004 presentation, the Quality
Assurance staff reported they had found severe underwriting errors, including evidence of
predatory lending, federal and state violations, and credit issues, in 25% of the loans they
audited in November and December 2003. In 2004, Chief Operating Officer and later CEO
Brad Morrice recommended these results be removed from the statistical tools used to track
loan performance, and in 2005, the department was dissolved and its personnel terminated.
The same year, the Internal Audit department identified numerous deficiencies in loan files;
out of nine reviews it conducted in 2005, it gave the company's loan production department
"unsatisfactory" ratings seven times. Patrick Flanagan, president of New Century's
mortgage-originating subsidiary, cut the department's budget, saying in a memo that the
"group was out of control and tries to dictate business practices instead of audit."
FCIC Report at 157.

154. On February 29, 2008, after an extensive document review and conducting over 100
interviews, Michael J. Missal, the Bankruptcy Court Examiner for New Century, issued a
detailed report on the various deficiencies at New Century, including lax mortgage
standards and a failure to follow its own underwriting guidelines. Among his findings, the
Examiner reported:

☐ "New Century had a brazen obsession with increasing loan originations, without due
regard to the risks associated with that business strategy…. Although a primary goal of
any mortgage banking company is to make more loans, New Century did so in an
aggressive manner that elevated the risks to dangerous and ultimately fatal levels."

☐ New Century also made frequent exceptions to its underwriting guidelines for borrowers
who might not otherwise qualify for a particular loan. A senior officer of New Century
warned in 2004 that the "number one issue is exceptions to the guidelines." Moreover,
many of the appraisals used to value the homes that secured the mortgages had
deficiencies.

☐ "New Century … layered the risks of loan products upon the risks of loose underwriting
standards in its loan originations to high risk borrowers."

Final Report of Michael J. Missal, Bankruptcy Examiner, In re New Century TRS Holdings, Inc., No. 07-10416 (KJC) (Bankr. Del. Feb. 29, 2008), available at http://graphics8.nytimes.com/packages/pdf/business/Final_Report_New_Century.pdf.

155. On December 9, 2009, the SEC charged three of New Century's top officers with violations of federal securities laws. The SEC's complaint details how New Century's representations regarding its underwriting guidelines, e.g., that New Century was committed to "adher[ing] to high origination standards in order to sell [its] loan products in the secondary market" and "only approv[ing] subprime loan applications that evidence a borrower's ability to repay the loan," were blatantly false.

156. Patricia Lindsay, a former Vice President of Corporate Risk at New Century, testified before the FCIC in April 2010 that, beginning in 2004, underwriting guidelines had been all but abandoned at New Century. Ms. Lindsay further testified that New Century systematically approved loans with 100 percent financing to borrowers with extremely low credit scores and no supporting proof of income. See Written Testimony of Patricia Lindsay for the FCIC Hearing, April 7, 2010 ("Lindsay Testimony"), http://fcic-static.law.stanford.edu/cdnmedia/fcic.testimony/2010-0407-Lindsay.pdf, at 3.

157. The originators of the mortgage loans underlying the Securitizations went beyond the systematic disregard of their own underwriting guidelines. As the FCIC has confirmed, mortgage loan originators throughout the industry pressured appraisers, during the period of the Securitizations, to issue inflated appraisals that met or exceeded the amount needed for the subject loans to be approved, regardless of the accuracy of such appraisals, and especially when the originators aimed at putting the mortgages into a package of mortgages that would be sold for securitization. This resulted in lower LTV ratios, discussed supra, which in turn made the loans appear to the investors less risky than they were.

158. As described by Patricia Lindsay, appraisers "fear[ed]" for their "livelihoods," and therefore cherry-picked data "that would help support the needed value rather than finding the best comparables to come up with the most accurate value." See Lindsay Test. at 5. Likewise, Jim Amorin, President of the Appraisal Institute, confirmed in his testimony that "[i]n many cases, appraisers are ordered or severely pressured to doctor their reports and to convey a particular, higher value for a property, or else never see work from those parties again …. [T]oo often state licensed and certified appraisers are forced into making a 'Hobson's Choice.'" See Testimony of Jim Amorin to the FCIC, available at www.appraisalinstitute.org/newsadvocacy/downloads/ltrs_tstmny/2009/AI-ASA-ASFMRANAIFATestimonyonMortgageReform042309final.pdf. Faced with this choice, appraisers systematically abandoned applicable guidelines and over-valued properties in order to facilitate the issuance of mortgages that could then be collateralized into mortgage-backed securitizations.

## 2. The Collapse of the Certificates' Credit Ratings Further Indicates That the Mortgage Loans Were Not Originated in Adherence to the Stated Underwriting Guidelines

159. The total collapse in the credit ratings of the GSE Certificates, typically from AAA or its equivalent to non-investment speculative grade, is further evidence of the originators' systematic disregard of underwriting guidelines, indicating that the GSE Certificates were impaired from the start.

160. The GSE Certificates that Fannie Mae and Freddie Mac purchased were originally assigned credit ratings of AAA or its equivalent, which purportedly reflected the description of the mortgage loan collateral and underwriting practices set forth in the Registration Statements. These ratings were artificially inflated, however, as a result of the very same misrepresentations that the Defendants made to investors in the Prospectus Supplements.

161. HSBC provided or caused to be provided loan-level information to the rating agencies that they relied upon in order to calculate the Certificates' assigned ratings, including the borrower's LTV ratio, debt-to-income ratio, owner occupancy status, and other loan-level information described in aggregation reports in the Prospectus Supplements. Because the information that HSBC provided or caused to be provided was false, the ratings were inflated and the level of subordination that the rating agencies required for the sale of AAA (or its equivalent) certificates was inadequate to provide investors with the level of protection that those ratings signified. As a result, the GSEs paid Defendants inflated prices for purported AAA (or its equivalent) Certificates, unaware that those Certificates actually carried a severe risk of loss and carried inadequate credit enhancement.

162. Since the issuance of the Certificates, the ratings agencies have dramatically downgraded their ratings to reflect the revelations regarding the true underwriting practices used to originate the mortgage loans, and the true value and credit quality of the mortgage loans. Table 8 details the extent of the downgrades.[10]

163. On information and belief, the Kinney's Securitization involve the same set allegations as pertaining to the 17 Securitizations; Plaintiffs need to propound further discovery to identify the particulars pertaining to the Kinney's Securitizations.

---

[10]Applicable ratings are shown in sequential order separated by forward slashes: Moody's/S&P/Fitch. A hyphen between forward slashes indicates that the relevant agency did not provide a rating at issuance.

Table 8

| Transaction | Tranche | Rating at Issuance (Moody's/S&P/Fitch) | Rating at July 31, 2011 (Moody's/S&P/Fitch) |
|---|---|---|---|
| FFML 2006-FF4 | 1A | Aaa/AAA/AAA | B1/AAA/B |
| FFML 2006-FF5 | 1A | Aaa/AAA/AAA | Caa1/BB-/CC |
| FFML 2006-FF7 | 1A | Aaa/AAA/AAA | Caa1/CCC/CC |
| FFML 2006-FF9 | 1A | Aaa/AAA/AAA | Caa3/B-/CC |
| FFML 2006-FF11 | 1A1 | Aaa/AAA/AAA | B3/CCC/CC |
| | 1A2 | Aaa/AAA/AAA | Ca/CCC/CC |

| Transaction | Tranche | Rating at Issuance (Moody's/S&P/Fitch) | Rating at July 31, 2011 (Moody's/S&P/Fitch) |
|---|---|---|---|
| HASC 2005-I1 | 1A | Aaa/AAA/AAA | Caa1/CCC/CC |
| HASC 2006-HE1 | 1A | Aaa/AAA/AAA | Ca/CCC/C |
| HASC 2006-HE2 | 1A | Aaa/AAA/AAA | Caa1/CCC/C |
| HASC 2006-NC1 | 1A | Aaa/AAA/— | B3/BB-/-- |
| HASC 2006-OPT1 | 1A | Aaa/AAA/AAA | A2/AAA/B |
| HASC 2006-OPT2 | 1A | Aaa/AAA/AAA | Aa1/AAA/A |
| HASC 2006-OPT3 | 1A | Aaa/AAA/AAA | Aa2/AAA/BB |
| | 1IA | Aaa/AAA/AAA | Baa2/AAA/CCC |
| HASC 2006-OPT4 | 1A | Aaa/AAA/AAA | Ba1/A/CCC |
| HASC 2007-HE1 | 1A | Aaa/AAA/AAA | Caa1/CCC/C |
| HASC 2007-HE2 | 1A | Aaa/AAA/AAA | Caa1/CCC/C |
| HASC 2007-OPT1 | 1A | Aaa/AAA/AAA | Caa1/BBB-/CC |
| HASC 2007-WF1 | 1A | Aaa/AAA/— | Caa2/B-/-- |

### 3. The Surge in Mortgage Delinquency and Default Further Demonstrates That the Mortgage Loans Were Not Originated in Adherence to the Stated Underwriting Guidelines

164. Even though the Certificates purchased by Fannie Mae and Freddie Mac were supposed to represent long-term, stable investments, a significant percentage of the mortgage loans backing the Certificates have defaulted, have been foreclosed upon, or are delinquent, resulting in massive losses to the Certificateholders. The overall poor performance of the mortgage loans is a direct consequence of the fact that they were not underwritten in accordance with applicable underwriting guidelines as represented in the Registration Statements.

165. Loan groups that were properly underwritten and contained loans with the characteristics represented in the Registration Statements would have experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and

delinquencies than occurred here.  Table 9 reflects the percentage of loans in the Supporting Loan Groups that are in default, have been foreclosed upon, or are delinquent as of July 2011.

166. On information and belief, the Kinney's Securitization involve the same set allegations as pertaining to the 17 Securitizations; Plaintiffs need to propound further discovery to identify the particulars pertaining to the Kinney's Securitizations.

Table 9

| Transaction | Tranche | Percentage of Delinquent/Defaulted/Foreclosed Loans |
|---|---|---|
| FFML 2006-FF1 | IA | 54.3 |
| FFML 2006-FF5 | IA | 52.4 |
| FFML 2006-FF7 | IA | 48.6 |

| Transaction | Tranche | Percentage of Delinquent/Defaulted/Foreclosed Loans |
|---|---|---|
| FFML 2006-FF9 | IA | 49.6 |
| FFML 2006-FF11 | IA1 | 42.3 |
|  | IA2 | 42.3 |
| HASC 2005-I1 | IA | 67.4 |
| HASC 2006-HE1 | IA | 56.9 |
| HASC 2006-HE2 | IA | 55.7 |
| HASC 2006-NC1 | IA | 53.0 |
| HASC 2006-OPT1 | IA | 38.4 |
| HASC 2006-OPT2 | IA | 37.7 |
| HASC 2006-OPT3 | IA | 32.2 |
|  | IIA | 35.7 |
| HASC 2006-OPT4 | IA | 40.5 |
| HASC 2007-HE1 | IA | 60.7 |
| HASC 2007-HE2 | IA | 66.5 |
| HASC 2007-OPT1 | IA | 45.5 |
| HASC 2007-WF1 | IA | 39.9 |

167. The confirmed misstatements concerning owner occupancy and LTV ratios, the confirmed, systematic underwriting failures by the originators responsible for the mortgage loans across the Securitizations, and the extraordinary drop in credit rating and rise in delinquencies across those Securitizations, all confirm that the mortgage loans in the

Supporting Loan Groups, contrary to the representations in the Registration Statements, were not originated in accordance with the stated underwriting guidelines.

## V.   FANNIE MAE'S AND FREDDIE MAC'S PURCHASES OF THE GSE CERTIFICATES AND THE RESULTING DAMAGES

168. In total, between December 20, 2005 and July 3, 2007, Fannie Mae and Freddie Mac purchased over $6.2 billion in residential mortgage-backed securities issued in connection with the Securitizations.  Table 10 reflects each of Freddie Mac's purchases of the Certificates.[11]

169. On information and belief, the Kinney's Securitization involve the same set allegations as pertaining to the 17 Securitizations; Plaintiffs need to propound further discovery to identify the particulars pertaining to the Kinney's Securitizations.

Table 10

| Transaction | Tranche | CUSIP | Settlement Date of Purchase by Freddie Mac | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Freddie Mac |
|---|---|---|---|---|---|---|
| FFML 2006-FF11 | 1A | 32027NYF9 | 1 27 2006 | 266,292,000.00 | 100.00 | HSBC Securities |
| FFML 2006-FF5 | 1A | 32027EAB7 | 5 5 2006 | 691,180,000.00 | 100.00 | HSBC Securities |
| FFML 2006-FF9 | 1A | 32027GAB4 | 7 7 2006 | 712,134,000.00 | 100.00 | HSBC Securities |
| HASC 2005-H | 1A | 40430HCV8 | 12 30 2005 | 132,963,000.00 | 100.00 | HSBC Securities |
| HASC 2006-HE1 | 1A | 4432xAAA3 | 11 3 2006 | 591,377,000.00 | 100.00 | HSBC Securities |
| HASC 2006-NC1 | 1A | 40430HDQ7 | 1 7 2006 | 119,285,000.00 | 100.00 | HSBC Securities |
| HASC 2006-OPT1 | 1A | 40430HCZ9 | 2 3 2006 | 265,088,000.00 | 100.00 | HSBC Securities |
| HASC 2006-OPT2 | 1A | 40430HDV7 | 2 24 2006 | 364,076,000.00 | 100.00 | HSBC Securities |
| HASC 2006-OPT3 | 11A | 40430HFB6 | 4 5 2006 | 230,449,000.00 | 100.00 | HSBC Securities |
| HASC 2007-HE1 | 1A | 40430EAA9 | 3 4 2007 | 577,450,000.00 | 100.00 | HSBC Securities |
| HASC 2007-HE2 | 1A | 40430RAA4 | 5 4 2007 | 326,874,000.00 | 100.00 | HSBC Securities |
| HASC 2007-OPT1 | 1A | 40431JAA3 | 1 36 2007 | 448,787,000.00 | 100.00 | HSBC Securities |
| HASC 2007-WF1 | 1A | 40431RAA3 | 7 3 2007 | 195,515,000.00 | 100.00 | HSBC Securities |

170. Table 11 below reflects each of Fannie Mae's purchases of the Certificates:

---

[11] Purchased securities in Tables 10 and 11 are stated in terms of unpaid principal balance of the relevant Certificates.  Purchase prices are stated in terms of percentage of par.

Table 11

| Transaction | Tranche | CUSIP | Settlement Date of Purchase by Fannie Mae | Initial Unpaid Principal Balance | Purchase Price (% of Par) | Seller to Fannie Mae |
|---|---|---|---|---|---|---|
| FFML 2006-FF7 | 1A | 32027NAB2 | 5/31/2006 | 356,603,000.00 | 100.00 | HSBC Securities |
| FFML 2006-FF11 | 1A2 | 32028PAA1 | 9/6/2006 | 535,012,000.00 | 100.00 | HSBC Securities |
|  | 1A2 | 32028PAB1 | 9/6/2006 | 141,503,000.00 | 100.00 | HSBC Securities |
| HASC 2006-HE2 | 1A | 44328RAB4 | 12/5/2006 | 384,335,000.00 | 100.00 | HSBC Securities |
| HASC 2006-OPT3 | 1A | 46450BFG8 | 4/5/2006 | 141,905,000.00 | 100.00 | HSBC Securities |
| HASC 2006-OPT4 | 1A | 40430KAB7 | 4/28/2006 | 284,847,000.00 | 100.00 | HSBC Securities |

171. The statements and assurances in the Registration Statements regarding the credit quality and characteristics of the mortgage loans underlying the GSE Certificates, and the origination and underwriting practices pursuant to which the mortgage loans were originated, which were summarized in such documents, were material to a reasonable investor's decision to purchase the GSE Certificates.

172. The false statements of material facts and omissions of material facts in the Registration Statements, including the Prospectuses and Prospectus Supplements, directly caused Fannie Mae and Freddie Mac to suffer hundreds of millions of dollars in damages, including without limitation depreciation in the value of the securities. The mortgage loans underlying the GSE Certificates experienced defaults and delinquencies at a much higher rate than they would have had the loan originators adhered to the underwriting guidelines set forth in the Registration Statements, and the payments to the trusts were therefore much lower than they would have been had the loans been underwritten as described in the Registration Statements.

173. Fannie Mae's and Freddie Mac's losses have been much greater than they would have been if the mortgage loans had the credit quality represented in the Registration Statements.

174. HSBC's misstatements and omissions in the Registration Statements regarding the true characteristics of the loans were the proximate cause of Fannie Mae's and Freddie Mac's losses relating to their purchase of the GSE Certificates. Based upon sales of the Certificates or similar certificates in the secondary market, HSBC proximately caused hundreds of millions of dollars in damages to Fannie Mae and Freddie Mac in an amount to be determined at trial.

## VI.   STATE OF OREGON, MULTNOMAH COUNTY AND THE CITY OF PORTLAND MISAPPROPRIATED FEDERAL FUNDS SPECIFICALLY ALLOCATED FOR AT-RISK AND/OR DISPLACED HOMEOWNERS AND/OR RENTERS (RE-LOCATION FUNDING)

### A.  The N/NE Neighborhood Strategy Fund

175. The North/Northeast Neighborhood Housing Strategy, a five-year plan for how to invest the $20 million according to the stated priorities of the community, was originally presented to Portland City Council on January 28, 2015. Today, the N/NE Housing Strategy is a living plan and currently operates with a $75 million-dollar budget.

176. On information and belief, Defendants Multnomah County and/or the City of Portland have, and/or caused to be, submitted materially false or misleading statements to the U.S. Federal Government regarding application for said Federal funding in which Defendants have specifically misrepresented to be allocated pursuant to its North/Northeast Neighborhood Housing Strategy which directly make-up the Plaintiff class who constitute "at-risk homeowners of displacement to foreclosures" in Multnomah County Portland Oregon, between the periods of January 2015 to present.

177. On information and belief, said Defendants have misappropriated said funds towards excessive administrative salary increases, employer/employee benefit increases, ect.

### B. Multnomah County Misappropriated Funds from MERS settlement intended specifically for Plaintiff Class

178. Defendants have scienter of Defendant Mortgage electronic Registration Systems' involvement in rampant Residential Mortgage Backed Securities (RMBS) Fraud.

179. In December 2010, MERS executive R.K. Arnold came before the Oregon Senate Interim Committee on Consumer Protection and Public Affairs (link is external).

180. The company was involved in the buying and selling of about 50 percent of all mortgages in the country, he explained, facilitating buying and selling through million of "electronic handshakes."

181. The next year MERS tried, unsuccessfully, to insert language into a state affordable housing bill that would have changed recording requirements and created a new definition of beneficiary. The language would have retroactively protected MERS and saved the MERS business model in Oregon.

182. In the fall of 2012 Multnomah County filed a lawsuit against MERS and 16 member banks alleging fraudulent misrepresentation, tampering with public records, making false written statements and "undermining the accuracy and integrity of Multnomah County's document recording system." It sought damages, a correction of historic filings and accurate and transparency filings in the future.

183. In 2013, as the case worked its way to federal court, the Oregon Supreme Court took up the question in a separate case, affirming a lower court ruling that MERS cannot be a beneficiary on a deed of trust in Oregon.

184. In 2015, the county agreed to settle the case.

185. "We have set a national precedent," said Portland attorney Tom D'Amore. "We changed the business practice of these banks in Multnomah County. Recording will be corrected so we have a clear picture of who owns what."

186. The agreement stipulates that county employees cannot discuss the terms. But moving forward, MERS will no longer be listed as a beneficiary in county filings.

187. Defendants have presented materially false or misleading statements as the Kinney's case still references MERS as a beneficiary in the 2004 Deed of Reconveyance.

### C. Portland Housing Bureau misappropriated federal funds specifically allocated for Home Owner Retention Program

188. Kurt Creager served as Portland Housing Director from 2015 to 2017. As of 2017 Shannon Callahan is the bureau director of the Portland Housing Program.

189. On information and belief, from 2015 to present, said directors presented materially false statements in its annual Budget Request to the U.S. Government, whereby said directors misappropriated federal funding purportedly allocated to the Home Owner Retention Program;

190. Defendants have instead misappropriated said funds to pay excessive administrative salaries and/or costs.

191. On information and belief, from 2015 to present, said directors created regulations and/or policies regarding the allocation of federal funding intended for the Home Owner Retention Program that sought to re-loan said federal funds to at-risk homeowners, thus placing further encumbrances on applicants' properties creating more hardships and burdens on home owners.

### D. Defendants Used the Federal and State of Oregon Judiciary to Perpetrate a Fraud on the American People

192. On November 5, 2018, Plaintiffs William X Nietzche, William Kinney Jr and Julie Metcalf Kinney filed a verified complaint in federal U.S. District Court for the District of Oregon Portland Division case#3:18-cv-01930 alleging several charges for damages against several Defendants.

193. Defendant Michael Simon, acting as a purported U.S. District Court judge, was assigned to the abovesaid case as presiding judge.

194. On November 18, 2018, Defendants Mark K. Passanante, Terrance Slominski and Roman Ozeruga, ignited an inferior court action in Multnomah County Circuit Court State of Oregon case#18LT6113 in a conspiratorial attempt, with the other remaining Defendants, to displace the Kinneys from their home.

195. Said acts by Defendants Mark G. Passanante, Terrance Slominski and Roman Ozeruga constitutes a gross fraud committed on the court, thus infringing upon the 5th Amendment Due Process clause to the Constitution for the United States of America 1791.

196. On October 8, 2019, Defendant Michael Simon acted ultra-vires rendered an inferior judgement dismissing Plaintiff's verified Complaint with prejudice despite plaintiifs complaint procuring 3 Answers from 3 of the Defendants.

197. Said act by Defendant Michael Simon in using a judicial function of the United States Federal Government constitutes a gross fraud committed upon the court and the Plaintiff Class under the guise of color of law.

### E.  DEFENDANTS HAD A DUTY TO DISMISS UHD'S INFERIOR FED ACTION AFTER BEING NOTICED OF A PARALLEL LITIGATION REGARDING THE SAME SET OF LAW AND FACTS PENDING IN FEDERAL COURT

PLAINTIFF'S NOVEMBER 2018 SPECIAL RESTRICTED APPEARANCE IN FRONT OF PURPORTED JUDGE STEPHEN BUSHONG

198. On or about November, 22, 2018, Defendant Bushong was put on actual notice of Plaintiff Kinney's pending complaint in U.S. District Court case #3:18-cv-01930.

199. Defendant Bushong had a duty to dismiss the inferior FED action back in November 2018 when made aware of the fact that Plaintiffs filed a verified complaint in the federal court before the instigation of the FED action.

200. That same day prior to said hearing before Defendant Bushong, Plaintiff Kinney's filed a notice of removal to federal court and two (2) other documents; Bushong pretended to locate 2 of said documents; however, Defendant Bushong and his judicial assistant pretended the third document (Notice of Removal) was lost.

201. Shortly thereafter, Defendant Bushong eventually found said document and made a determination that the inferior Multnomah county court for the state of Oregon was "divested of its jurisdiction" to hear any further matters relating to the FED action.

202. Plaintiff Kinneys filed its verified claim in U.S. District Court on November 5, 2018; Defendant UHD filed this inferior state court action on November 19, 2018, nearly two weeks after Plaintiff Kinneys filed its verified federal claim. (See attached U.S. District Court minute order issued by purported judge Michael Simon dated January 23, 2019).

203. Defendant Bushong had a duty to dismiss the inferior FED action and not merely pretend to be divested of jurisdiction based on Plaintiff Kinney's notice of removal;

204. Because, as indicated by Simon in his denial of Defendants remand back to state court, "This case was not removed from state court but was filed in federal court with a complaint and purported federal jurisdiction based on the purported violation of federal statutes. Plaintiffs did not file a Notice of Removal. Moreover, this case was filed on November 5,

2018 and the state court referenced by Urban Housing Development was filed on November 19, 2018." (SEE ATTACHED U.S. District Court minute order issued by purported judge Michael Simon dated January 23, 2019).

205. By Defendant Bushong's failure to act, this constitutes a gross fraud upon the court.

PLAINTIFF KINNEY'S NOVEMBER 2019 SPECIAL RESTRICTED APPEARANCE IN FRONT OF PURPOTED JUDGE STEPHEN BUSHONG

206. A year later, on or about November, 6, 2019, Defendant Bushong was put on actual notice of Plaintiff Kinney's pending complaint in U.S. District Court case #3:18-cv-01930.

207. Defendant Bushong had a duty to dismiss the inferior FED action back in November 2018, as well as November 2019 when made aware of the fact that Plaintiff Kinneys filed a verified complaint in the federal court before the instigation of the FED action, along with its pending appeal to the U.S. Court of Appeals for the Ninth Circuit case #19-35876.

PLAINTIFF KINNEY'S OCTOBER 2019 SPECIAL RESTRICTED APPEARANCE IN FRONT OF PURPORTED JUDGE LAWRENCE WEISBERG

208. A year later, on or about October 23, 2019, Defendant Weisberg was put on actual notice of Plaintiff Kinney's pending complaint in U.S. District Court case #3:18-cv-01930 and its pending appeal to the U.S. Court of Appeals for the Ninth Circuit case #19-35876.

209. Defendant Weisberg had a duty to dismiss the inferior FED action back on October 2019 when made aware of the fact that Plaintiff Kinneys filed a verified complaint in the federal court before the instigation of the FED action.

210. By Defendant Weisberg's failure to act, this constitutes a gross fraud upon the court.

PLAINTIFF KINNEY'S NOVEMBER 2019 SPECIAL RESTRICTED APPEARANCE IN FRONT OF PURPORTED JUDGE STEPHEN TODD

211. A year later, on or about November 12, 2019, Defendant Todd was put on actual notice of Plaintiff Kinney's pending complaint in U.S. District Court case #3:18-cv-01930 and its pending appeal to the U.S. Court of Appeals for the Ninth Circuit case #19-35876.

212. Defendant Todd had a duty to dismiss the inferior FED action back on November 2019 when made aware of the fact that Plaintiff Kinneys filed a verified complaint in the federal court before the instigation of the FED action.

213. By Defendant Todd's failure to act, this constitutes a gross fraud upon the court.

ORCP 21 (3) AND THE DOCTRINE OF CLAIM PRECLUSION

214. Counter-defendants had a duty to dismiss the FED action pursuant to ORCP 21 (3) and the doctrine of claim preclusion.

215. ORCP 21 (3) provides for the dismissal of an action when "there is another action pending between the same parties for the same cause." Dismissal for another action

pending under ORCP 21 (3) furthers the same purpose as that underlying the application of general claim preclusion principles-viz, to "prevent [ ] requiring a party to litigate the same claim twice on the merits." Lee v. Mitchell, 152 Ore App 159, 164, 165 (1998). Thus, there is a "close connection" between dismissal under ORCP 21 A (3) and the claim preclusion doctrines of merger and bar, and "determining whether either applies involves similar considerations." Id., at 164-65. Accordingly, "[i]f entry of a judgment in the other pending actions would preclude plaintiffs from asserting any claims in this case, the court should dismiss those claims." Ram Tech. Servs. V. Koresko, 240 Ore. App. 620, 630 (2011).

216. "The doctrine of claim preclusion prohibits a party from relitigating the same claim or splitting a claim into multiple actions against the same opponent. The rule forecloses a party who has litigated a claim against another from further litigation on that same claim on any ground or theory of relief that the party could have litigated in the first instance. A 'claim is defined broadly as a group of facts which entitled the plaintiff to relief. In deciding whether a group of facts is part of the same claim, we inquire whether the transactions were related in time, space, origin, or motivation, and whether they form a convenient unit, as well as whether they were substantially of the same sort and similarly motivated." G.B. v. Morey, 229 Ore App 605, 608-09, (2009).

217. "Case on appeal in federal court is still pending and state court case which asserts same claims is therefore subject to dismissal on ground that there is another case pending." Beetham v. Georgia-Pacific, 87 Or App 592, 743 P2d 755 (1987).

218. Counter-defendants failure to dismiss the FED action infringes upon Article 6, section 2, and the V Amendment to the Constitution for the United States of America 1791.

### F.  William Kinney and Julie Ann Metcalf Kinney are the Original Source of Information

219. William and Julie Kinney (hereinafter "the Kinneys") have first-hand knowledge that is independent of and materially adds to the publicly disclosed allegations as alleged above made towards the HSBC Defendants in 2011 by the FHFA.

220. In March 2002, Defendant Freedom Mortgage Corporation solicited the Kinneys into one of the defected loans at issue that were eventually securitized, bundled up and re-sold to GSE's, and domestic and foreign investors.

221. On information and belief, Defendants FMC and the HSBC Defendants created inequitable corporate policies wherein Defendants designed targeted refinance strategies aimed at borrowers who were detected to have defected loan documents, in an attempt to create binding novation contracts with said borrowers to cover-up the defected transactions ab intio.

2002 LOAN

222. *In March 2002 Defendant Freedom Mortgage Corporation, through one of its subsidiaries Homecomings Financial LLC solicited the Kinneys into a purported mortgage loan.

223. In April 2016, Freedom Mortgage Corporation agreed to pay the United States $113 million to resolve allegations that it violated the False Claims Act by knowingly originating and underwriting single family mortgage loans insured by the U.S. Department of Housing and Urban Development's (HUD) Federal Housing Administration (FHA) that did not meet applicable requirements for the FHA insurance program.

224. Between Jan. 1, 2006, and Dec. 31, 2011, Defendant Freedom Mortgage Corporation certified mortgage loans for FHA insurance that did not meet HUD underwriting requirements and were therefore not eligible for FHA mortgage insurance. Freedom Mortgage did not adhere to FHA's quality control (QC) requirements. Between 2006 and 2008, Freedom Mortgage did not share its early payment default (EPD) QC reviews with production and underwriting management, nor did it require responses to its EPD QC findings from its production or underwriting staff. Due to staffing limitations between 2008 and 2010, Freedom Mortgage did not always perform timely QC reviews or perform audits of all EPD loans, as required by HUD. An EPD is a loan that becomes 60 days past due within the first six months of the loan. The EPD QC reviews that Freedom Mortgage did perform revealed high defect rates, exceeding 30 percent between 2008 and 2010. Yet, between 2006 and 2011, Freedom Mortgage did not report a single improperly originated loan to HUD, despite its obligation to do so. In 2012, after identifying hundreds of loans that "possibly should have been self-reported to HUD," it reported only one. As a result of Freedom Mortgage's conduct, HUD insured hundreds of loans that were not eligible for FHA mortgage insurance under the DEL program, and that HUD would not otherwise have insured and subsequently incurred substantial losses when it paid insurance claims on the ineligible loans approved by Freedom Mortgage.

225. Homecomings Financial was the mortgage servicers of the 2002 DOT.

226. Homecomings Financial is a subsidiary of GMAC.

227. GMAC formed Homecomings Financial in 1995 from the purchased assets of another company. In 2005, ownership of GMAC Mortgage, GMAC-RFC, and Homecomings was transferred to a newly formed holding company, the Residential Capital Corp. (ResCap)

228. On March 12, 2007 (the "Closing Date"), RASC Series 2007-EMX1 Trust (the "Issuing Entity") issued and sold Home Equity Mortgage Asset-Backed Pass-Through Certificates, Series 2007-EMX1.

229. As of the Closing Date, Homecomings Financial, LLC ("Homecomings") and GMAC Mortgage, LLC ("GMACM"), each an affiliate of the master servicer, Residential Funding Company, LLC, and the depositor, Residential Asset Securities Corporation, acted as subservicers of approximately 78.5% and 21.5%, respectively, by principal balance of the mortgage loans owned by the Issuing Entity.

230. Residential Capital, LLC ("ResCap"), which owns indirectly all of the equity of both Homecomings and GMACM, has restructured the operations of Homecomings and GMACM.

231. As a result of such restructuring, on September 24, 2007, Homecomings transferred its servicing platform and certain employees responsible for the servicing function to its affiliate GMACM.

232. Subsequent to the transfer of the servicing platform and employees from Homecomings to GMACM, GMACM became the subservicer for all of the mortgage loans owned by the Issuing Entity, and Homecomings will no longer service any of the mortgage loans.

233. In addition, GMACM will be servicing all of the GMACM and Homecomings servicing portfolios, which will consist of the aggregate of the amounts set forth below under the headings "GMAC Mortgage LLC Primary Servicing Portfolio" and "Homecomings Financial, LLC Servicing Portfolio."

234. GMACM is a Delaware limited liability company and a wholly-owned subsidiary of GMAC Residential Holding Company, LLC, which is a wholly owned subsidiary of ResCap.

235. ResCap is a Delaware limited liability company and a wholly-owned subsidiary of GMAC Mortgage Group, LLC, which is a wholly-owned subsidiary of GMAC LLC.

236. On August 24, 2007, Fitch Ratings reduced GMACM's residential primary subservicer rating and residential primary servicer rating for Alt-A product from RPS1 to RPS1- and placed the servicer ratings on Rating Watch Negative.

237. GMACM began acquiring, originating and servicing residential mortgage loans in 1985 through its acquisition of Colonial Mortgage Service Company, which was formed in 1926, and the loan administration, servicing operations and portfolio of Norwest Mortgage, which entered the residential mortgage loan business in 1906.

238. These businesses formed the original basis of what is now GMACM.

239. GMACM maintains its executive and principal offices at 1100 Virginia Drive, Fort Washington, Pennsylvania 19034.

240. Its telephone number is (215) 734-5000.

241. In addition, GMACM purchases mortgage loans originated by GMAC Bank, which is wholly-owned by IB Finance Holding Company, LLC, a subsidiary of ResCap and GMAC LLC, and which is an affiliate of GMACM.

242. Formerly known as GMAC Automotive Bank, GMAC Bank, a Utah industrial bank was organized in 2001.

243. As of November 22, 2006, GMAC Bank became the successor to substantially all of the assets and liabilities of GMAC Bank, a federal savings bank.

244. GMACM generally retains the servicing rights with respect to loans it sells or securitizes, and also occasionally purchases mortgage servicing rights from other servicers or acts as a subservicer of mortgage loans (and does not hold the corresponding mortgage servicing right asset).

245. As of the six months ended June 30, 2007, GMACM acted as primary servicer and owned the corresponding servicing rights on approximately 2,271,474 of residential mortgage loans having an aggregate unpaid principal balance of approximately $284 billion, and GMACM acted as subservicer (and did not own the corresponding servicing rights) on approximately 334,864 loans having an aggregate unpaid principal balance of over $70.5 billion.

2004 RE-FINANCE LOAN

246. In May 2004 the HSBC Defendants, through one of its subsidiaries Beneficial Oregon Incorporated (hereinafter "BOI"), solicited the Kinneys into a purported mortgage re-finance.

### G. FORENSIC LOAN AUDITS CONDUCTED IN 2018 RELATING TO THE KINNEY'S 2002 AND 2004 LOANS

247. In 2018, the Kinneys had two forensic loan audits conducted by Certified Forensic Loan Auditors who investigated the 2002 purported loan with FMC, as well as the 2004 purported loan with HSBC/BOI.

248. The first forensic audit conducted December 14, 2018, pertaining to the 2004 Transaction with the HSBC Defendants revealed numerous fraudulent robo-signed assignments of the secured registered instruments that purportedly collateralized the Kinney's property structure.

249. The second forensic audit conducted December 31, 2018, pertaining to the 2002 Transaction with Defendant FMC revealed original source information pertaining to a fraudulent assignment on MERS regarding the secured registered instruments that purportedly collateralized the Kinney's property structure.

250. Both forensic audits came with a Bloomberg Report that also revealed original source information pertaining to fraudulent reporting to FHA and SEC regarding the securitization pool the Kinney's loan was .

251. Plaintiff Kinneys had a Forensic Chain of Title Securitization Analysis completed by a qualified expert to verify the claims of this complaint. (Exhibit LL pg. 49-53) Affidavit of Andrew Lehman.

253. Plaintiff Kinneys are the Superior Recorded owners of the Prime Market Property 4406 N Mississippi Ave, Portland Oregon. (Exhibit B) Grant/Warranty Deed.

254. Plaintiff Kinneys were issued an Uncertificated Security to execute in the capacity of (Accommodation Party) to a Tangible Note Bill of Exchange on March 12, 2004 regarding a purported loan to (Accommodated Party) Beneficial Oregon, Inc. for $126,524.92.

255. Defendant Beneficial Oregon, Inc. is an account debtor Accommodated Party to a 26 U.S. Code § 1031 – Exchange of property held for productive use or investment.

256. Plaintiff Kinneys herein allege that the signatures on the Tangible Note Bill of Exchange instrument as the Accommodation party constitutes a statutory capacity as Surety for the Non-Depository Payor Bank, the original Accommodated secured party of record, acting as Trustee/Account Debtor pursuant to a Special Deposit 26 U.S. Code§1031 – Exchange of property held for productive use or investment.

257. Plaintiff Kinneys purportedly pledged a Constructive Deed of Trust granting Legal Title to Accommodate Beneficial Oregon, Inc. to file against Plaintiff Kinney's Superior Claim to Title filed in the Official Records of the Multnomah County Recorder's Office on March 17, 2004 as ins# 2004.43211 (Exhibit C) Deed of Trust.

258. The purported Mortgage loan contracts between the parties are specific as to the duties of each party.

259. On or before June 29, 2005, the Closing Date of HEL 2005-I Trust, Plaintiff Kinney's Note was sold to the Trust.

260. There is no contemporaneous assignment of Plaintiff Kinney's Deed of Trust to the Trustee of the Trust.

261. Plaintiff Kinney's Note and Deed of Trust are irreparably separated.

262. On May 11, 2017, an Assignment of Deed of Trust was filed with the Multnomah County Recorder's Office as ins# 2017.57440.

263. The May 11, 2017 assignment was executed by Ed Chavez, as Vice President of MTGLQ Investors, LP, as Attorney-in Fact, without providing the power of attorney or legal representation agreement.

264. Ed Chavez failed to disclose his true employment with the Assignee while signing on behalf of the Assignor.

265. On November 16, 2017, an Assignment of Deed of Trust was filed with the Multnomah County Recorder's Office as ins#2017.138593.

266. The November 16, 2017, assignment was executed by Patrick Couture back in August 10, 2017, as Vice President of MTGLQ Investors, LP, without providing the power of attorney or legal representation agreement.

267. Patrick Couture failed to disclose his true employment with the Assignee while signing on behalf of the Assignor.

268. On March 30, 2018, an Assignment of Deed of Trust was filed with the Multnomah County Recorder's Office as ins# 2018.34155.

269. The March 30, 2018 assignment was executed by Jeannette Kabayan as Vice President of U.S. Bank Trust National Association, its Attorney-in-Fact without providing the power of attorney or legal representation agreement.

270. Jeannette Kabayan failed to disclose her true employment with the Assignee when signing on behalf of the Assignor.

271. On June 12, 2018, a Notice of Default was filed with the Multnomah County Recorder's Office as ins# 2018.062020.

272. Plaintiff Kinneys allege that only the Depositor, HSBC Home Equity Loan Corporation, is the rightful party that can convey the asset into the trust pursuant to investor offering documents as filed with the Securities and Exchange Commission.

**FIRST CAUSE OF ACTION**
**Violation of Section 11 of the Securities Act of 1933 (Against Defendants HSBC Securities, HSI Asset, Neal Leonard, Gerard Mattia, Todd White, and Jon Voigtman)**
273. Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly includes any and all allegations that could be construed as alleging fraud.

274. Plaintiff William and Julie Kinney (hereinafter "the Kinneys") have first-hand knowledge that is independent of and materially adds to the publicly disclosed allegations as alleged above made towards the HSBC Defendants in 2011 by the FHFA.

275. This claim is brought by Plaintiff pursuant to Section 11 of the Securities Act of 1933 and is asserted on behalf of Fannie Mae and Freddie Mac, which purchased the GSE Certificates issued pursuant to the Registration Statements. This claim is brought against Defendant HSBC Securities with respect to each of the Registration Statements. This claim is brought against (i) Defendant HSI Asset and (ii) Defendants Neal Leonard, Gerard Mattia, Todd White, and Jon Voigtman (the foregoing Individual Defendants collectively referred to as the "Section 11 Individual Defendants"), each with respect to the Registration Statements filed by HSI Asset that registered securities that were bona fide offered to the public on or after September 6, 2005.

276. This claim is predicated upon the strict liability of Defendant HSBC Securities for making false and materially misleading statements in the Registration Statements for the Securitizations and for omitting facts necessary to make the facts stated therein not misleading. Defendant HSI Asset and the Section 11 Individual Defendants are strictly liable for making false and materially misleading statements in the Registration Statements that registered securities that were bona fide offered to the public on or after September 6, 2005, which are applicable to 12 of the 17 Securitizations (as specified in Tables 1 and 2 above), and for omitting facts necessary to make the facts stated therein not misleading.

277. On information and belief, the Kinney's Securitization involve the same set allegations as pertaining to the 12 Securitizations; Plaintiffs need to propound further discovery to identify the particulars pertaining to the Kinney's Securitizations.

278. Defendant HSBC Securities served as underwriter of each of the Securitizations, and as such, is liable for the misstatements and omissions in the Registration Statements under Section 11 of the Securities Act.

279. Defendant HSI Asset is the registrant for the Securitizations and filed the Shelf Registration Statements. As depositor, Defendant HSI is the issuer of the GSE Certificates issued pursuant to the Registration Statements it filed within the meaning of Section 2(a)(4) of the Securities Act, 15 U.S.C. § 77b(a)(4), and in accordance with Section 11(a), 15 U.S.C. § 77k(a). As such, HSI Asset is liable under Section 11 of the Securities Act for the misstatements and omissions in those Registration Statements that registered securities that were bona fide offered to the public on or after September 6, 2005.

280. The Section 11 Individual Defendants were officers and/or directors of Defendant HSI Asset at the time the Registration Statements were filed in connection with the Securitizations. In addition, they signed the Registration Statements and either signed or authorized another to sign on their behalf the amendments to those Registration Statements. As such, the Section 11 Individual Defendants are liable under Section 11 of the Securities Act for the misstatements and omissions in those Registration Statements that registered securities that were bona fide offered to the public on or after September 6, 2005.

281. At the time that they became effective, each of the Registration Statements contained material misstatements of fact and omitted information necessary to make the facts stated therein not misleading, as set forth above. The facts misstated or omitted were material to a reasonable investor reviewing the Registration Statements.

282. The untrue statements of material facts and omissions of material fact in the Registration Statements are set forth above in Section IV and pertain to compliance with underwriting guidelines, occupancy status and loan-to-value ratios.

283. Fannie Mae and Freddie Mac purchased or otherwise acquired the GSE Certificates pursuant to the false and misleading Registration Statements. Fannie Mae and Freddie Mac made these purchases in the primary market. At the time they purchased the GSE Certificates, Fannie Mae and Freddie Mac did not know of the facts concerning the false

and misleading statements and omissions alleged herein, and if the GSEs would have known those facts, they would not have purchased the GSE Certificates.

284. HSBC Securities owed to Fannie Mae, Freddie Mac, and other investors a duty to make a reasonable and diligent investigation of the statements contained in the Registration Statements at the time they became effective to ensure that such statements were true and correct and that there were no omissions of material facts required to be stated in order to make the statements contained therein not misleading. The Section 11 Individual Defendants owed the same duty with respect to the Registration Statements that they signed that registered securities that were bona fide offered to the public on or after September 6, 2005, which are applicable to 12 of the Securitizations.

285. HSBC Securities and the Section 11 Individual Defendants did not exercise such due diligence and failed to conduct a reasonable investigation. In the exercise of reasonable care, these Defendants should have known of the false statements and omissions contained in or omitted from the Registration Statements filed in connection with the Securitizations, as set forth herein. In addition, HSI Asset, though subject to strict liability without regard to whether it performed diligence, also failed to take reasonable steps to ensure the accuracy of the representations.

286. Fannie Mae and Freddie Mac sustained substantial damages as a result of the misstatements and omissions in the Registration Statements.

287. This action is brought within three years of the date that Plaintiffs discovered the Defendants fraudulent sophisticated RMBS scheme, and is thus timely under the False Claims Act.

288. By reason of the conduct herein alleged, HSBC Securities, HSI Asset, and the Section 11 Individual Defendants are jointly and severally liable for their wrongdoing.

**SECOND CAUSE OF ACTION**
**Violation of Section 12(a)(2) of the Securities Act of 1933 (Against HSI Asset and HSBC Securities)**

289. Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly includes any and all allegations that could be construed as alleging fraud.

290. Plaintiff William and Julie Kinney (hereinafter "the Kinneys") have first-hand knowledge that is independent of and materially adds to the publicly disclosed allegations as alleged above made towards the HSBC Defendants in 2011 by the FHFA.

291. This claim is brought by Plaintiff pursuant to Section 12(a)(2) of the Securities Act of 1933 and is asserted on behalf of Fannie Mae and Freddie Mac, which purchased the GSE Certificates issued pursuant to the Registration Statements in the Securitizations listed in paragraph 2.

292. This claim is predicated upon HSBC Securities' and HSI Asset's negligence for making false and materially misleading statements in the Prospectuses (as supplemented by the Prospectus Supplements, hereinafter referred to in this Section as "Prospectuses") for the Securitizations listed in paragraph 2.

293. HSBC Securities and HSI Asset are prominently identified in the Prospectuses, the primary documents that they used to sell the GSE Certificates. HSBC Securities and HSI Asset offered the Certificates publicly, including selling to Fannie Mae and Freddie Mac their GSE Certificates, as set forth in the "Plan of Distribution" or "Underwriting" sections of the Prospectuses.

294. HSBC Securities and HSI Asset offered and sold the GSE Certificates to Fannie Mae and Freddie Mac by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading. HSBC Securities and HSI Asset reviewed and participated in drafting the Prospectuses.

295. HSBC Securities and HSI Asset successfully solicited Fannie Mae's and Freddie Mac's purchases of the GSE Certificates. As underwriter, HSBC Securities also obtained substantial commissions based upon the amount received from the sale of the Certificates to the public.

296. HSBC Securities and HSI Asset offered the GSE Certificates for sale, sold them, and distributed them by the use of means or instruments of transportation and communication in interstate commerce.

297. Each of HSBC Securities and HSI Asset actively participated in the solicitation of the GSEs' purchase of the GSE Certificates, and did so in order to benefit themselves. Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in marketing the GSE Certificates.

298. Each of the Prospectuses contained material misstatements of fact and omitted information necessary to make the facts stated therein not misleading. The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses.

299. The untrue statements of material facts and omissions of material fact in the Registration Statements, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, and loan-to-value ratios.

300. HSBC Securities and HSI Asset offered and sold the GSE Certificates offered pursuant to the Registration Statements directly to Fannie Mae and Freddie Mac, pursuant to the false and misleading Prospectuses.

301. HSBC Securities and HSI Asset owed to Fannie Mae and Freddie Mac, as well as to other investors in these trusts, a duty to make a reasonable and diligent investigation of the

statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.

302. HSBC Securities and HSI Asset failed to exercise such reasonable care. These defendants in the exercise of reasonable care should have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations as set forth above.

303. In contrast, Fannie Mae and Freddie Mac did not know of the untruths and omissions contained in the Prospectuses at the time they purchased the GSE Certificates. If the GSEs would have known of those untruths and omissions, they would not have purchased the GSE Certificates.

304. Fannie Mae and Freddie Mac acquired the GSE Certificates in the primary market pursuant to the Prospectuses.

305. Fannie Mae and Freddie Mac sustained substantial damages in connection with their investments in the GSE Certificates and have the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

306. This action is brought within three years of the date that Plaintiffs discovered Defendants fraudulent sophisticated RMBS scheme, and is thus timely under the False Claims Act.

**THIRD CAUSE OF ACTION**
**Violation of Section 15 of the Securities Act of 1933 (Against HSBC North America, HSBC USA, HSBC Markets, HSBC Bank, and the Individual Defendants)**

307. Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly includes any and all allegation that could be construed as alleging fraud.

308. Plaintiff William and Julie Kinney (hereinafter "the Kinneys") have first-hand knowledge that is independent of and materially adds to the publicly disclosed allegations as alleged above made towards the HSBC Defendants in 2011 by the FHFA.

309. This claim is brought under Section 15 of the Securities Act of 1933, 15 U.S.C. §77o ("Section 15"), against HSBC North America, HSBC USA, HSBC Markets, HSBC Bank, and the Individual Defendants for controlling-person liability with regard to the Section 11 and Section 12(a)(2) causes of action set forth above.

310. The Individual Defendants at all relevant times participated in the operation and management of HSI Asset, and conducted and participated, directly and indirectly, in the conduct of HSI Asset's business affairs. Defendant Neal Leonard was Chairman, Principal Executive Officer, and a Director of HSI Asset. Defendant Gerard Mattia was Treasurer, Principal Financial Officer, Principal Accounting Officer, and a Director of HSI Asset.

Defendant Todd White was a Director of HSI Asset. Defendant Norman Chaleff was a Director of HSI Asset. Defendant Jon Voigtman was a Managing Director at both HSBC Securities and HSI Asset.

311. Defendant HSBC Bank was the sponsor for all of the Securitizations and culpably participated in the violations of Sections 11 and 12(a)(2) set forth above with respect to the offering of the GSE Certificates by initiating the Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting HSI Asset as the special purpose vehicle, and selecting HSBC Securities as underwriter for the Securitizations. In its role as sponsor, HSBC Bank knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the cashflows would be issued by the relevant trusts.

312. Defendant HSBC Bank also acted as the seller of the mortgage loans for the Securitizations in that it conveyed such mortgage loans to Defendant HSI Asset pursuant to a Mortgage Loan Purchase Agreement.

313. Defendant HSBC Bank also controlled all aspects of the business of HSI Asset, as HSI Asset was merely a special purpose entity created for the purpose of acting as a pass-through for the issuance of the Certificates. Upon information and belief, the officers and directors of HSBC Bank overlapped with the officers and directors of HSI Asset. In addition, because of its position as sponsor, HSBC Bank was able to, and did in fact, control the contents of the Registration Statements, including the Prospectuses and Prospectus Supplements, which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

314. Defendant HSBC USA controlled the business operations of HSBC Bank, and Defendant HSBC Markets controlled the business operations of HSI Asset and HSBC Securities. As the corporate parents of HSBC Bank, HSI Asset, and HSBC Securities, HSBC USA and HSBC Markets had the practical ability to direct and control the actions of HSBC Bank, HSI Asset, and HSBC Securities in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of these Defendants in connection with the issuance and sale of the Certificates.

315. HSBC USA and HSBC Markets expanded their share of the residential mortgagebacked securitization market in order to increase revenue and profits. The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

316. HSBC USA and HSBC Markets culpably participated in the violations of Section 11 and 12(a)(2) set forth above. They oversaw the actions of their subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as HSI Asset and the issuing trusts to serve as conduits for the mortgage loans.

317. Defendant HSBC North America wholly owns HSBC USA and HSBC Markets and is the ultimate US-based parent of HSBC Bank, HSI Asset, and HSBC Securities. HSBC North America culpably participated in the violations of Sections 11 and 12(a)(2) set forth above. It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as HSI Asset and the issuing trusts to serve as conduits for the mortgage loans.

318. HSBC North America, HSBC USA, HSBC Markets, HSBC Bank, and the Individual Defendants are controlling persons within the meaning of Section 15 by virtue of their actual power over, control of, ownership of, and/or directorship of HSBC Securities and HSI Asset at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.

319. Fannie Mae and Freddie Mac purchased in the primary market Certificates issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading. The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements.

320. Fannie Mae and Freddie Mac did not know of the misstatements and omissions in the Registration Statements; had the GSEs known of those misstatements and omissions, they would not have purchased the GSE Certificates.

321. Fannie Mae and Freddie Mac have sustained damages as a result of the misstatements and omissions in the Registration Statements, for which they are entitled to compensation.

322. This action is brought within three years of the date that Plaintiffs discovered Defendants fraudulent sophisticated RMBS scheme, and is thus timely under the False Claims Act.

**FOURTH CAUSE OF ACTION**
**Violation of Section 13.1-552(A)(ii) of the Virginia Code (Against HSI Asset and HSBC Securities)**

323. Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly includes any and all allegation that could be construed as alleging fraud.

324. Plaintiff William and Julie Kinney (hereinafter "the Kinneys") have first-hand knowledge that is independent of and materially adds to the publicly disclosed allegations as alleged above made towards the HSBC Defendants in 2011 by the FHFA.

325. This claim is brought by Plaintiff pursuant to Section 13.1-552(A)(ii) of the Virginia Code and is asserted on behalf of Freddie Mac. The allegations set forth below in this cause of action pertain only to those GSE Certificates identified in Table 10 above that were purchased by Freddie Mac on or after September 6, 2006.

326. This claim is predicated upon HSBC Securities' and HSI Asset's negligence for making false and materially misleading statements in the Prospectuses for the Securitizations listed in paragraph 2.

327. HSBC Securities and HSI Asset are prominently identified in the Prospectuses, the primary documents that they used to sell the GSE Certificates. HSBC Securities and HSI Asset offered the Certificates publicly, including selling to Freddie Mac the GSE Certificates, as set forth in the "Plan of Distribution" or "Underwriting" sections of the Prospectuses.

328. HSBC Securities and HSI Asset offered and sold the GSE Certificates to Freddie Mac by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading. HSBC Securities and HSI Asset reviewed and participated in drafting the Prospectuses.

329. HSBC Securities and HSI Asset successfully solicited Freddie Mac's purchases of the GSE Certificates. As underwriter, HSBC Securities also obtained substantial commissions based upon the amount received from the sale of the Certificates to the public.

330. HSBC Securities offered the GSE Certificates for sale, sold them, and distributed them to Freddie Mac in the State of Virginia.

331. Each of HSBC Securities and HSI Asset actively participated in the solicitation of Freddie Mac's purchase of the GSE Certificates, and did so in order to benefit themselves. Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in marketing the GSE Certificates.

332. Each of the Prospectuses contained material misstatements of fact and omitted information necessary to make the facts stated therein not misleading. The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses.

333. The untrue statements of material facts and omissions of material fact in the Registration Statements, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, and loan-to-value ratios.

334. HSBC Securities and HSI Asset offered and sold the GSE Certificates offered pursuant to the Registration Statements directly to Freddie Mac, pursuant to the false and misleading Prospectuses.

335. HSBC Securities and HSI Asset owed to Freddie Mac, as well as to other investors in these trusts, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.

336. HSBC Securities and HSI Asset failed to exercise such reasonable care. These Defendants in the exercise of reasonable care should have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations as set forth above.

337. In contrast, Freddie Mac did not know of the untruths and omissions contained in the Prospectuses at the time it purchased the GSE Certificates. If Freddie Mac would have known of those untruths and omissions, it would not have purchased the GSE Certificates.

338. Freddie Mac sustained substantial damages in connection with its investments in the GSE Certificates and has the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

339. This action is brought within three years of the date that Plaintiffs discovered Defendants fraudulent sophisticated RMBS scheme, and is thus timely under the False Claims Act.

**FIFTH CAUSE OF ACTION**
**Violation of Section 13.1-552(C) of the Virginia Code (Against HSBC North America, HSBC USA, HSBC Markets, HSBC Bank, and the Individual Defendants)**

340. Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly includes any and all allegation that could be construed as alleging fraud.

341. Plaintiff William and Julie Kinney (hereinafter "the Kinneys") have first-hand knowledge that is independent of and materially adds to the publicly disclosed allegations as alleged above made towards the HSBC Defendants in 2011 by the FHFA.

342. This claim is brought under Section 13.1-552(C) of the Virginia Code and is asserted on behalf of Freddie Mac. The allegations set forth below in this cause of action pertain only to those GSE Certificates identified in Table 10 above that were purchased by Freddie Mac on or after September 6, 2006. This claim is brought against HSBC North America, HSBC USA, HSBC Markets, HSBC Bank, and the Individual Defendants for controlling-person liability with regard to the Fourth Cause of Action set forth above.

343. The Individual Defendants at all relevant times participated in the operation and management of HSI Asset, and conducted and participated, directly and indirectly, in the conduct of HSI Asset's business affairs. Defendant Neal Leonard was Chairman, Principal Executive Officer, and a Director of HSI Asset. Defendant Gerard Mattia was Treasurer, Principal Financial Officer, Principal Accounting Officer, and a Director of HSI Asset. Defendant Todd White was a Director of HSI Asset. Defendant Norman Chaleff was a Director of HSI Asset. Defendant Jon Voigtman was a Managing Director at both HSBC Securities and HSI Asset.

344. Defendant HSBC Bank was the sponsor for all of the Securitizations and culpably participated in the violation of Section 13.1-552(A)(ii) of the Virginia Code set forth above

with respect to the offering of the GSE Certificates by initiating the Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting HSI Asset as the special purpose vehicle, and selecting HSBC Securities as underwriter for the Securitizations. In its role as sponsor, HSBC Bank knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the cashflows would be issued by the relevant trusts.

345. Defendant HSBC Bank also acted as the seller of the mortgage loans for the Securitizations in that it conveyed such mortgage loans to Defendant HSI Asset pursuant to a Mortgage Loan Purchase Agreement.

346. Defendant HSBC Bank also controlled all aspects of the business of HSI Asset, as HSI Asset was merely a special purpose entity created for the purpose of acting as a pass-through for the issuance of the Certificates. Upon information and belief, the officers and directors of HSBC Bank overlapped with the officers and directors of HSI Asset. In addition, because of its position as sponsor, HSBC Bank was able to, and did in fact, control the contents of the Registration Statements, including the Prospectuses and Prospectus Supplements, which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

347. Defendant HSBC USA controlled the business operations of HSBC Bank, and Defendant HSBC Markets controlled the business operations of HSI Asset and HSBC Securities. As the corporate parents of HSBC Bank, HSI Asset, and HSBC Securities, HSBC USA and HSBC Markets had the practical ability to direct and control the actions of HSBC Bank, HSI Asset, and HSBC Securities in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of these Defendants in connection with the issuance and sale of the Certificates.

348. HSBC USA and HSBC Markets expanded their share of the residential mortgagebacked securitization market in order to increase revenue and profits. The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

349. HSBC USA and HSBC Markets culpably participated in the violation of Section 13.1-552(A)(ii) of the Virginia Code set forth above. They oversaw the actions of their subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as HSI Asset and the issuing trusts to serve as conduits for the mortgage loans.

350. Defendant HSBC North America wholly owns HSBC USA and HSBC Markets and is the ultimate US-based parent of HSBC Bank, HSI Asset, and HSBC Securities. HSBC North America culpably participated in the violation of Section 13.1-552(A)(ii) of the Virginia Code set forth above. It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and

established special purpose financial entities such as HSI Asset and the issuing trusts to serve as conduits for the mortgage loans.

351. HSBC North America, HSBC USA, HSBC Markets, HSBC Bank, and the Individual Defendants are controlling persons within the meaning of Section 13.1-522(C) of the Virginia Code by virtue of their actual power over, control of, ownership of, and/or directorship of HSBC Securities and HSI Asset at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.

352. Freddie Mac purchased Certificates issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.  The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements.

353. Freddie Mac did not know of the misstatements and omissions in the Registration Statements; had Freddie Mac known of those misstatements and omissions, it would not have purchased the GSE Certificates.

354. Freddie Mac has sustained damages as a result of the misstatements and omissions in the Registration Statements, for which it is entitled to compensation.

355. This action is brought within three years of the date that Plaintiffs discovered Defendants fraudulent sophisticated RMBS scheme, and is thus timely under the False Claims Act.

## SIXTH CAUSE OF ACTION
### Violation of Section 31.5606.05(a)(1)(B) of the District of Columbia Code (Against HSI Asset and HSBC Securities)

356. Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly includes any and all allegation that could be construed as alleging fraud.

357. Plaintiff William and Julie Kinney (hereinafter "the Kinneys") have first-hand knowledge that is independent of and materially adds to the publicly disclosed allegations as alleged above made towards the HSBC Defendants in 2011 by the FHFA.

358. This claim is brought by Plaintiff pursuant to Section 31-5606.05(a)(1)(B) of the District of Columbia Code and is asserted on behalf of Fannie Mae.  The allegations set forth below in this cause of action pertain only to those GSE Certificates identified in Table 11 above that were purchased by Fannie Mae.

359. This claim is predicated upon HSBC Securities' and HSI Asset's negligence for making false and materially misleading statements in the Prospectuses for the Securitizations listed in paragraph 2.

360. HSBC Securities and HSI Asset are prominently identified in the Prospectuses, the primary documents that they used to sell the GSE Certificates. HSBC Securities and HSI Asset offered the Certificates publicly, including selling to Fannie Mae its GSE Certificates, as set forth in the "Plan of Distribution" or "Underwriting" sections of the Prospectuses.

361. HSBC Securities and HSI Asset offered and sold the GSE Certificates to Fannie Mae by means of the Prospectuses, which contained untrue statements of material facts and omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading. HSBC Securities and HSI Asset reviewed and participated in drafting the Prospectuses.

362. HSBC Securities and HSI Asset successfully solicited Fannie Mae's purchases of the GSE Certificates. As underwriter, HSBC Securities also obtained substantial commissions based upon the amount received from the sale of the Certificates to the public.

363. HSBC Securities offered the GSE Certificates for sale, sold them, and distributed them to Fannie Mae in the District of Columbia.

364. Each of HSBC Securities and HSI Asset actively participated in the solicitation of Fannie Mae's purchase of the GSE Certificates, and did so in order to benefit themselves. Such solicitation included assisting in preparing the Registration Statements, filing the Registration Statements, and assisting in marketing the GSE Certificates.

365. Each of the Prospectuses contained material misstatements of fact and omitted information necessary to make the facts stated therein not misleading. The facts misstated and omitted were material to a reasonable investor reviewing the Prospectuses.

366. The untrue statements of material facts and omissions of material fact in the Registration Statements, which include the Prospectuses, are set forth above in Section IV, and pertain to compliance with underwriting guidelines, occupancy status, and loan-to-value ratios.

367. HSBC Securities and HSI Asset offered and sold the GSE Certificates offered pursuant to the Registration Statements directly to Fannie Mae, pursuant to the false and misleading Prospectuses.

368. HSBC Securities and HSI Asset owed to Fannie Mae, as well as to other investors in these trusts, a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true, and to ensure that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading.

369. HSBC Securities and HSI Asset failed to exercise such reasonable care. These Defendants in the exercise of reasonable care should have known that the Prospectuses contained untrue statements of material facts and omissions of material facts at the time of the Securitizations as set forth above.

370. In contrast, Fannie Mae did not know of the untruths and omissions contained in the Prospectuses at the time it purchased the GSE Certificates. If Fannie Mae would have known of those untruths and omissions, it would not have purchased the GSE Certificates.

371. Fannie Mae sustained substantial damages in connection with its investments in the GSE Certificates and has the right to rescind and recover the consideration paid for the GSE Certificates, with interest thereon.

372. This action is brought within three years of the date that Plaintiffs discovered Defendants fraudulent sophisticated RMBS scheme, and is thus timely under the False Claims Act.

**SEVENTH CAUSE OF ACTION**
**Violation of Section 31-5606.05(c) of the District of Columbia Code (Against HSBC North America, HSBC USA, HSBC Markets, HSBC Bank, and the Individual Defendants)**

373. Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly includes any and all allegation that could be construed as alleging fraud.

374. Plaintiff William and Julie Kinney (hereinafter "the Kinneys") have first-hand knowledge that is independent of and materially adds to the publicly disclosed allegations as alleged above made towards the HSBC Defendants in 2011 by the FHFA.

375. This claim is brought under Section 31-5606.05(c) of the District of Columbia Code and is asserted on behalf of Fannie Mae. The allegations set forth below in this cause of action pertain only to those GSE Certificates identified in Table 11 above that were purchased by Fannie Mae. This claim is brought against HSBC North America, HSBC USA, HSBC Markets, HSBC Bank, and the Individual Defendants for controlling-person liability with regard to the Sixth Cause of Action set forth above.

376. The Individual Defendants at all relevant times participated in the operation and management of HSI Asset, and conducted and participated, directly and indirectly, in the conduct of HSI Asset's business affairs. Defendant Neal Leonard was Chairman, Principal Executive Officer, and a Director of HSI Asset. Defendant Gerard Mattia was Treasurer, Principal Financial Officer, Principal Accounting Officer, and a Director of HSI Asset. Defendant Todd White was a Director of HSI Asset. Defendant Norman Chaleff was a Director of HSI Asset. Defendant Jon Voigtman was a Managing Director at both HSBC Securities and HSI Asset.

377. Defendant HSBC Bank was the sponsor for all of the Securitizations and culpably participated in the violation of Section 31-5606.05(a)(1)(B) of the District of Columbia Code set forth above with respect to the offering of the GSE Certificates by initiating the Securitizations, purchasing the mortgage loans to be securitized, determining the structure of the Securitizations, selecting HSI Asset as the special purpose vehicle, and selecting HSBC Securities as underwriter for the Securitizations. In its role as sponsor, HSBC Bank

knew and intended that the mortgage loans it purchased would be sold in connection with the securitization process, and that certificates representing the ownership interests of investors in the cashflows would be issued by the relevant trusts.

378. Defendant HSBC Bank also acted as the seller of the mortgage loans for the Securitizations in that it conveyed such mortgage loans to Defendant HSI Asset pursuant to a Mortgage Loan Purchase Agreement.

379. Defendant HSBC Bank also controlled all aspects of the business of HSI Asset, as HSI Asset was merely a special purpose entity created for the purpose of acting as a pass-through for the issuance of the Certificates. Upon information and belief, the officers and directors of HSBC Bank overlapped with the officers and directors of HSI Asset. In addition, because of its position as sponsor, HSBC Bank was able to, and did in fact, control the contents of the Registration Statements, including the Prospectuses and Prospectus Supplements, which contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading.

380. Defendant HSBC USA controlled the business operations of HSBC Bank, and Defendant HSBC Markets controlled the business operations of HSI Asset and HSBC Securities. As the corporate parents of HSBC Bank, HSI Asset, and HSBC Securities, HSBC USA and HSBC Markets had the practical ability to direct and control the actions of HSBC Bank, HSI Asset, and HSBC Securities in issuing and selling the Certificates, and in fact exercised such direction and control over the activities of these Defendants in connection with the issuance and sale of the Certificates.

381. HSBC USA and HSBC Markets expanded their share of the residential mortgagebacked securitization market in order to increase revenue and profits. The push to securitize large volumes of mortgage loans contributed to the inclusion of untrue statements of material facts and omissions of material facts in the Registration Statements.

382. HSBC USA and HSBC Markets culpably participated in the violation of Section 31-5606.05(a)(1)(B) of the District of Columbia Code set forth above. They oversaw the actions of their subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as HSI Asset and the issuing trusts to serve as conduits for the mortgage loans.

383. Defendant HSBC North America wholly owns HSBC USA and HSBC Markets and is the ultimate US-based parent of HSBC Bank, HSI Asset, and HSBC Securities. HSBC North America culpably participated in the violation of Section 31-5606.05(a)(1)(B) of the District of Columbia Code set forth above. It oversaw the actions of its subsidiaries and allowed them to misrepresent the mortgage loans' characteristics in the Registration Statements and established special-purpose financial entities such as HSI Asset and the issuing trusts to serve as conduits for the mortgage loans.

384. HSBC North America, HSBC USA, HSBC Markets, HSBC Bank, and the Individual Defendants are controlling persons within the meaning of Section 31-5606.05(c) of the

District of Columbia Code by virtue of their actual power over, control of, ownership of, and/or directorship of HSBC Securities and HSI Asset at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Registration Statements.

385. Fannie Mae purchased Certificates issued pursuant to the Registration Statements, including the Prospectuses and Prospectus Supplements, which, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading. The facts misstated and omitted were material to a reasonable investor reviewing the Registration Statements.

386. Fannie Mae did not know of the misstatements and omissions in the Registration Statements; had Fannie Mae known of those misstatements and omissions, it would not have purchased the GSE Certificates.

387. Fannie Mae has sustained damages as a result of the misstatements and omissions in the Registration Statements, for which it is entitled to compensation.

388. This action is brought within three years of the date that Plaintiffs discovered Defendants fraudulent sophisticated RMBS scheme, and is thus timely under the False Claims Act.

**EIGHTH CAUSE OF ACTION**
**Common Law Negligent Misrepresentation (Against HSI Asset and HSBC Securities)**
389. Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly includes any and all allegation that could be construed as alleging fraud.

390. Plaintiff William and Julie Kinney (hereinafter "the Kinneys") have first-hand knowledge that is independent of and materially adds to the publicly disclosed allegations as alleged above made towards the HSBC Defendants in 2011 by the FHFA.

391. This is a claim for common law negligent misrepresentation against Defendants HSI Asset and HSBC Securities.

392. Between December 20, 2005 and July 3, 2007, HSI Asset and HSBC Securities sold the GSE Certificates to the GSEs as described above. Because HSI Asset owned and then conveyed the underlying mortgage loans that collateralized the Securitizations for which it served as depositor, HSI Asset had unique, exclusive, and special knowledge about the mortgage loans in the Securitizations through its possession of the loan files and other documentation.

393. Likewise, as underwriter for all of the Securitizations, HSBC Securities was obligated to—and had the opportunity to—perform sufficient due diligence to ensure that the Registration Statements, including without limitation the corresponding Prospectus Supplements, did not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not

misleading. As a result of this privileged position as underwriter—which gave it access to loan file information and obligated it to perform adequate due diligence to ensure the accuracy of the Registration Statements—HSBC Securities had unique, exclusive, and special knowledge about the underlying mortgage loans in the Securitizations.

394. HSBC Securities also had unique, exclusive, and special knowledge of the work of third-party due diligence providers, such as Clayton, who identified significant failures of originators to adhere to the underwriting standards represented in the Registration Statements. The GSEs, like other investors, had no access to borrower loan files prior to the closing of the Securitizations and their purchase of the Certificates. Accordingly, when determining whether to purchase the GSE Certificates, the GSEs could not evaluate the underwriting quality or the servicing practices of the mortgage loans in the Securitizations on a loan-by-loan basis. The GSEs therefore reasonably relied on HSBC Securities' knowledge and its express representations made prior to the closing of the Securitizations regarding the underlying mortgage loans.

395. HSI Asset and HSBC Securities were aware that the GSEs reasonably relied on HSI Asset's and HSBC Securities' reputations and unique, exclusive, and special expertise and experience, as well as their express representations made prior to the closing of the Securitizations, and that the GSEs depended upon these Defendants for complete, accurate, and timely information. The standards under which the underlying mortgage loans were actually originated were known to these Defendants and were not known, and could not be determined, by the GSEs prior to the closing of the Securitizations.

396. Based upon their unique, exclusive, and special knowledge and expertise about the loans held by the trusts in the Securitizations, HSI Asset and HSBC Securities had a duty to provide the GSEs complete, accurate, and timely information regarding the mortgage loans and the Securitizations. HSI Asset and HSBC Securities negligently breached their duty to provide such information to the GSEs by instead making to the GSEs untrue statements of material facts in the Securitizations, or otherwise misrepresenting to the GSEs material facts about the Securitizations. The misrepresentations are set forth in Section IV above, and include misrepresentations as to the accuracy of the represented credit ratings, compliance with underwriting guidelines for the mortgage loans, and the accuracy of the owner-occupancy statistics and the loan-to-value ratios applicable to the Securitizations, as disclosed in the term sheets and Prospectus Supplements.

397. In addition, having made actual representations about the underlying collateral in the Securitizations and the facts bearing on the riskiness of the Certificates, HSI Asset and HSBC Securities had a duty to correct misimpressions left by their statements, including with respect to any "half truths." The GSEs were entitled to rely upon HSI Asset's and HSBC Securities' representations about the Securitizations, and these Defendants failed to correct in a timely manner any of their misstatements or half truths, including misrepresentations as to compliance with underwriting guidelines for the mortgage loans.

398. Fannie Mae and Freddie Mac purchased the GSE Certificates based upon the representations by HSBC as the sponsor, depositor, and lead and selling underwriter in all

17 of the Securitizations. HSBC provided term sheets to the GSEs that contained critical data as to the Securitizations, including with respect to anticipated credit ratings by the credit rating agencies, loan-to-value and combined loan-to-value ratios for the underlying collateral, and owner occupancy statistics. This data was subsequently incorporated into Prospectus Supplements that were received by the GSEs upon the close of each Securitization.

399. The GSEs relied upon the accuracy of the data transmitted to them and subsequently reflected in the Prospectus Supplements. In particular, the GSEs relied upon the credit ratings that the credit rating agencies indicated they would bestow on the Certificates based on the information provided by HSBC relating to the collateral quality of the underlying loans and the structure of the Securitization. These credit ratings represented a determination by the credit rating agencies that the GSE Certificates were "AAA" quality (or its equivalent)—meaning the Certificates had an extremely strong capacity to meet the payment obligations described in the respective PSAs.

400. HSBC, as sponsor, depositor, and lead and selling underwriter in all 17 of the Securitizations, provided detailed information about the underlying collateral and structure of each Securitization it sponsored to the credit rating agencies. The credit rating agencies based their ratings on the information provided to them by HSBC, and the agencies' anticipated ratings of the Certificates were dependent on the accuracy of that information. The GSEs relied on the accuracy of the anticipated credit ratings and the actual credit ratings assigned to the Certificates by the credit rating agencies, and upon the accuracy of HSBC's representations in the term sheets and Prospectus Supplements.

401. In addition, the GSEs relied on the fact that the originators of the mortgage loans in the Securitizations had acted in conformity with their underwriting guidelines, which were described in the Prospectus Supplements. Compliance with underwriting guidelines was a precondition to the GSE's purchase of the GSE Certificates in that the GSEs' decision to purchase the Certificates was directly premised on their reasonable belief that the originators complied with applicable underwriting guidelines and standards.

402. In purchasing the GSE Certificates, the GSEs justifiably relied on HSBC's false representations and omissions of material fact detailed above, including the misstatements and omissions in the term sheets about the underlying collateral, which were reflected in the Prospectus Supplements.

403. But for the above misrepresentations and omissions, the GSEs would not have purchased or acquired the Certificates as they ultimately did, because those representations and omissions were material to their decision to acquire the GSE Certificates, as described above.

404. The GSEs were damaged in an amount to be determined at trial as a direct, proximate, and foreseeable result of HSI Asset's and HSBC Securities' misrepresentations, including any half truths.

405. This action is brought within three years of the date that Plaintiffs discovered Defendants fraudulent sophisticated RMBS scheme, and is thus timely under the False Claims Act.

## NINTH CAUSE OF ACTION
**Trespass (Against URBAN HOUSING DEVELOPMENT, Roman Ozeruga, Mark G. Passanante, Terrance Slominski, Michael H. Simon, Tom Purcell, Robert S. Phed, Steve W. Pite, John G. Aldridge Lawrence Randell Weisberg, Stephen Bushong, Amy Baggio, Steven A Todd, and Mark A. Peterson)**

406. Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly includes any and all allegation that could be construed as alleging fraud.

### INTRODUCTION RE FRAUD ON THE COURT

407. Each of the State Actor Defendants exceeded their jurisdiction acting ultra-vires by either directly, through an agent, or in concert with another wherein the Plaintiff Class were deprived of its right to life and a court of record under color of law without jurisdiction or good cause.

408. Plaintiffs, under color of law, have been deprived of its right to due process.

409. Although Plaintiffs objected to the assumed jurisdiction, those who usurped Plaintiffs court of record under color of law did not respond to any of Plaintiffs demands and requests for proof of jurisdiction.

410. State Actor Defendants Michael Simon, Lawrence Weisberg, Stephen Bushong, Amy Baggio, Stephen A Todd and Mark A. Peterson continued to assume their pseudo-jurisdiction without proof of jurisdiction or any attempt at proof of jurisdiction.

411. Plaintiffs continue to be subject, under color of law, to the assumed jurisdiction, will and control of the inferior U.S. District court for the District of Oregon, Portland Division and inferior Multnomah County Circuit Court State of Oregon.

SPECIFICS RELATING TO ORIGINAL SOURCE INFORMATION FROM THE KINNEY CASE

412. Each of the State Actor Defendants acted in such a way, or failed to act in such a way, thus causing deprivation of Plaintiffs right to a court of record under color of law and/or authority of an inferior court not of record.

413. Each of the State Actor Defendants acted to deprive Plaintiffs of its court of record; or each of the State Actor Defendants failed to act to prevent the loss of Plaintiffs right to a court of record.

414. Further, each of the State Actor Defendants is a willing participant acting in concert with each of the remaining State Actor Defendants.

415. At all times mentioned in this action each of the State Actor Defendant is the agent of the other, and in doing the acts alleged in this action, each is acting within the course and scope of said agency. The following paragraphs describe what the State Actor Defendants, under color of law, either acted or failed to act as obligated.

416. Each of the State Actor Defendants exceeded their jurisdiction acting ultra-vires under color of law and/or authority of a court not of record. Each of the State Actor Defendants acted in concert with the remaining State Actor Defendants to effect the unlawful loss of Plaintiffs court of record.

417. Said State Actor Defendants willfully conspired to, and did contemptuously subvert the Kinney's validly issued subpoena duces tecum for records and deposition served upon Tom Purcell on September 17, 2019.

418. Further grounds are that said State Actor Defendants willfully conspired to, and did contemptuously subvert the Kinney's properly issued subpoena by the issuance of Defendant Michael Simon's predetermined minute order dated September 20, 2019.

419. The consequence of said contemptuous behavior is to interfere with the conduct of the business of the court, and subsequently the rights of the parties to orderly due process, and the authority and dignity of this court of record.

420. Under color of law, State Actor Defendants Michael Simon and Tom Purcell did conspire through a personal email to convene a court not of record via telephone, thus assuming the jurisdiction of the Kinney's court of record to proceed in an inferior nisi prius court not of record.

421. The Oregon 1859 Constitution defines all Oregon courts to be courts of record;[12]

422. Title 28 U.S.C. 132 also defines all federal district courts to be courts of record.[13]

423. On September 20, 2019, Plaintiffs were involuntarily brought before a court not of record and also not a nisi prius court. See Reporter's Transcripts (hereinafter RT) which contains a true and correct copy of the official record of the said Transcript. Michael Simon acted as a tribunal and magistrate. Tom Purcell acted as an attorney. Plaintiffs Nietzche and Julie objected to the jurisdiction of the court. State Actor Defendant Michael Simon without proof of jurisdiction, ignored Plaintiff's objections, and proceeded under color of law to continue proceeding in the inferior court. At no time has Plaintiffs agreed to proceed in the inferior court not of record.

---

[12] Oregon Constitution, Article 7 Judicial Department, Sec. 1. Courts in which judicial power vested. The Judicial power of the State shall be vested in a Supreme [sic] Court, Circuit [sic] Courts, and County Courts, which shall be Courts of Record, having general jurisdiction, to be defined, limited, and regulated by law in accordance with this Constitution.
[13] 28 U.S. Code § 132.Creation and composition of district courts (a): There shall be in each judicial district a district court which shall be a court of record known as the United States District Court for the district.

ULTRA-VIRES

424. On examination of all available information, Plaintiffs are unable to ascertain that the State Actor Defendants acted within their constitutionally limited defined spheres of authority, thus said State Actor Defendants have acted ultra-vires in a conspiratorial attempt to proceed in the inferior court not of record.

425. Therefore, on information and belief, Plaintiffs allege that said State Actor Defendant Michael Simon acted ultra-vires exceeding his jurisdiction;

426. and did not have authorization from Plaintiffs to extra judicially proceed.[14]

427. Plaintiff demands that the State Actor Defendants Michael Simon, Stephen Bushong, Lawrence Weisberg, Amy Baggio, Stephen A. Todd and Mark A. Peterson submit to the court proof of jurisdiction, if any they have.

428. Plaintiffs demand that the above-entitled court of record find that said State Actor Defendants acted ultra-vires without jurisdiction in the Kinney's case to quash Plaintiff's lawfully issued subpoena and/or halt Plaintiff's right to discovery, and that said State Actor Defendants be recused from interfering in Plaintiffs cause any further.

429. Because of the actions committed with actual, constructive and implied force or the lack of action of the State Actor Defendants, Plaintiffs are immediately and directly injured and suffered loss of liberty, and deprived of its rights to a quality life and a court of record under color of law.

430. State Actor Defendants have a duty to not cause Plaintiffs to be deprived of its substantive right to a court of record under color of law and/or authority of any inferior court order. Further, State Actor Defendant Michael Simon had a duty to not proceed in the inferior court when objection to jurisdiction is asserted.

---

[14] "However late this objection has been made, or may be made in any cause, in an inferior or appellate court of the United States, it must be considered and decided, before any court can move one further step in the cause; as any movement is necessarily the exercise of jurisdiction. Jurisdiction is the power to hear and determine the subject matter in controversy between parties to a suit, to adjudicate or exercise any judicial power over them; the question is, whether on the case before a court, their action is judicial or extra-judicial; with or without the authority of law, to render a judgment or decree upon the rights of the litigant parties. If the law confers the power to render a judgment or decree, then the court has jurisdiction; what shall be adjudged or decreed between the parties, and with which is the right of the case, is judicial action, by hearing and determining it. 6 Peters, 709; 4 Russell, 415; 3 Peters, 203-7" Cited by STATE OF RHODE ISLAND v. COM. OF MASSACHUSETTS, 37 U.S. 657, 718 (1838)

"Where a Court has jurisdiction, it has a right to decide every question which occurs in the cause; and whether its decision be correct or otherwise, its judgment, until reversed, is regarded as binding in every other Court. But, if it act without authority, its judgments and orders are regarded as nullities. They are not voidable, but simply void; and form no bar to a recovery sought, even prior to a reversal, in opposition to them. They constitute no justification; and all persons concerned in executing such judgments or sentences, are considered, in law, as trespassers." Elliott v Peirsol, 1 Pet. 328, 340, 26 U.S. 328, 340, 7L.Ed. 164 (1828)

431. State Actor Defendants have breached that duty in a conspiratorial attempt to deny Plaintiffs its right to Due process.

432. The damages for the injury caused by State Actor Defendant Michael Simon actions are $50,000 for each instance State Actor Defendant Michael Simon has entered an inferior court minute order contrary to law and/or authority of the court of record.

433. The damages for the injury caused by State Actor Defendant Tom Purcell actions are $50,000 for each instance State Actor Defendant Tom Purcell has conspired and/or colluded with Michael Simon to enter an inferior court minute order contrary to law and/or authority of the court of record.

434. The damages for the injury caused by the State Actor Defendants' absence of required action is $5,000 for each failure to act.

### TENTH CAUSE OF ACTION – TRESPASS ON THE CASE

435. Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly includes any and all allegation that could be construed as alleging fraud.

436. By right, Plaintiffs reasonably expect to proceed without injury, secure in its capacities. By right, Plaintiffs are entitled to due process.

437. State Actor Defendants have a legal duty to use due care and not cause an injury to Plaintiffs or interfere with said rights in any way.

438. State Actor Defendants breached that duty by proximately or legally, directly and indirectly, causing the injuries to Plaintiff.

439. The damages claimed are all a result of the injuries.

### ELEVENTH CAUSE OF ACTION – TRESPASS ON THE CASE
VICARIOUS LIABILITY

440. Plaintiff realleges each allegation above as if fully set forth herein, except to the extent that Plaintiff expressly includes any and all allegation that could be construed as alleging fraud.

441. Power is never without responsibility. And when authority derives in part from Government's thumb on the scales, the exercise of that power by private persons becomes closely akin, in some respects, to its exercise by Government itself.

442. The purpose of imposing vicarious liability is to insure the costs of injuries resulting from defective actions are placed on the source of the actions and others who make the actions possible rather than on injured persons who are powerless to protect themselves. For a

Defendant to be vicariously liable it must play an integral and vital part in the overall production and promotion activity so that the actor is in a position to affect others, or, at the very least, it must provide a link in the chain of exposing the ultimate victim to the actor. The vicariously liable Defendant must be in the business of controlling, leasing, bailing, or licensing the actors.

443. Each State Actor Defendant is an agent of the other, and each has his place in the chain of exposing Plaintiffs to the actors. Each State Actor Defendant is vicariously liable for each instance of injury to Plaintiffs.

### TWELFTH CAUSE OF ACTION – FALSE CLAIMS ACT VIOLATIONS
RMBS FRAUD DISCOVERED THROUGH THE KINNEY CASE

444. Defendants Freedom Mortgage Corporation, HSBC Plc, Bank of New York violated the False Claims Act by knowingly originating and underwriting mortgages that did not meet FHA standards.

445. Defendant Freedom Mortgage Corporation defrauded investors throughout the United States and the world in connection with its sale of residential mortgage-backed securities (RMBS) from 2002 through 2007.

446. Defendant HSBC defrauded investors throughout the United States and the world in connection with its sale of residential mortgage-backed securities (RMBS) from 2004 through 2007.

447. Instead of ensuring that their representations to investors were accurate and transparent, Defendants FMC and HSBC affirmatively misled investors and withheld crucial information from them about the loans in its deals.

448. Defendants FMC and HSBC placed a higher priority on selling bonds and making profits than accurately representing the quality of the underlying loans to investors.

449. Said practices resulted in massive losses to investors, harmed homeowners, and ultimately jeopardized the banking system.

450. Defendants actions violated the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), based on mail fraud, wire fraud, bank fraud, and other misconduct.

451. From 2006 through 2007, Defendants misled investors about the quality of billions of dollars in subprime and Alt-A mortgage loans backing Defendants RMBS deals.

452. Specifically, in publicly-filed offering documents, Defendants knowingly misrepresented key characteristics of the loans, thereby concealing the fact that the loans were much riskier and much more likely to default than Defendants represented.

453. Ultimately, Defendants RMBS sustained catastrophic losses.

454. The United States government, as well as state and local governments, financed the purchase of various mortgage-backed securities[15] that used the other Defendants[16] as trustees or servicers.

455. Said governments were "deceived into purchasing" "fraudulent" mortgage-backed securities with missing or forged assignments, or without properly negotiated or endorsed notes.

456. Defendants, inter alia, assets and failed to legally transfer mortgage pools in accordance with transfer [and] exchange protocol of relevant pooling and services agreements.

457. Defendants sold billions of dollars of Fannie Mae government insured, guaranteed, originated mortgages, based upon false representations, as to the quality of the mortgages sold into securitizations;

458. Defendants borrowed billions of dollars from the Federal Home Loan [Mortgage] Corporation based upon false financial statements;

459. Defendants instituted foreclosure actions using false and fabricated documents.

FRAUD ON THE COURT AND/OR JUDICIAL FRAUD

460. Each of said Defendants, either acting independently, or in conspiratorial conjunction with the other named Defendants, did knowingly, intelligently, with actual scienter, and acting under color of law and ultra-vires, did unlawfully use a judicial function of the United States to perpetrate a fraud upon the U.S. Federal Government, thus breaching of the Constitution for the United States of America 1791, and the False Claims Act.

---

[15] 14 "Mortgage-backed securities are debt obligations that represent claims to the cash flows from pools of mortgage loans, most commonly on residential property. Loans are purchased from banks, mortgage companies, and other originators and then assembled into pools by a governmental, quasi-governmental, or private entity," otherwise known as a depositor. Mortgage Backed Securities, Sec. & Exchange Commission (July 23, 2010), https://www.sec.gov/answers/mortgagesecurities.htm. The depositor conveys the pooled loans to legal trusts set up for the purpose of holding legal title to the loans, and, in exchange, receives certificates that the depositor then sells to an underwriter, which the underwriter then sells to investors—a process known as "securitization." Joint Mot. at 3; see also Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp., 603 F.3d 23, 25 (2d Cir. 2010).

[16] The other Defendants are: (1) trustees that controlled a number of mortgage-backed securitized trusts whose assets consisted solely of pools of residential mortgages in Oregon and elsewhere in the United States and were to be acquired from HSBC, or (2) various "facilitators" of HSBC who aided and abetted HSBC's wrongful conduct.

461. Each of said Defendants, either acting independently, or in conspiratorial conjunction with the other named Defendants, did knowingly, intelligently, with actual scienter, and acting under color of law and ultra-vires, did unlawfully use a judicial function of the United States Government to Perpetrate a fraud upon the court of record in case #3:18-cv-01930 United States District Court for the District of Oregon Portland Division, ordained by Plaintiffs/Relators, the original source of information.

462. Each of said Defendants, either acting independently, or in conspiratorial conjunction with the other named Defendants, did knowingly, intelligently, with actual scienter, and acting under color of law and ultra-vires, did unlawfully use a judicial function of a State Government Constituency of the United States Federal Government to Perpetrate a fraud upon the court of record in case #18LT16113 MULTNOMAH COUNTY CIRCUIT COURT STATE OF OREGON, as ordained by Plaintiffs/Relators, the original source of information.

ORS 86 INFRINGES UPON THE V AMENDMENT

463. Defendants used ORS 86 as an engine of fraud to dispossess Plaintiffs of their property.

464. ORS 86 infringes upon the V Amendment Due Process clause to the Constitution for the United States of America 1791.

465. Defendants are instigating Forcible Eviction Detainer actions pursuant to ORS 86 to deprive Plaintiffs of their property without due process of law.

466. Therefore, ORS 86 shall be repealed for conflicting with the Constitution for the United States of America 1791.

HAMP VIOLATIONS

467. The allegations in the preceding paragraphs above are incorporated herein by reference.

468. By virtue of the acts described above, the Defendants knowingly or recklessly presented or caused to be presented to the United States false or fraudulent claims for payment or approval, including but not limited to improper claims for payment of HAMP (1) upfront fees and/or (2) unallowable costs for each loan modification in direct violation of, inter alia, 31 U.S.C. § 3729(a)(1)(A).

469. In so doing, the Defendants acted knowingly or recklessly; that is, the Defendants possessed actual knowledge that the claims for payment were false or fraudulent; acted in deliberate ignorance of the truth or falsity of the claims for payment; or acted in reckless disregard of the truth or falsity of the claims for payment.

470. By virtue of the acts described above, the Defendants made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim in direct violation of, inter alia, 31 U.S.C. § 3729(a)(1)(B).

471. In so doing, the Defendants acted knowingly or recklessly; that is, the Defendants possessed actual knowledge that the information, statements and representations were false or fraudulent; acted in deliberate ignorance of the truth or falsity of the information, statements and representations; or acted in reckless disregard of the truth or falsity of the information, statements and representations.

472. More specifically, Defendants caused false claims and statements to be made and submitted to HAMP. Truthful and accurate claims and statements are a condition precedent to both issuance of and payment under federal statues and HAMP guidelines.

473. Had the Government known that the federal regulations and HAMP guidelines were violated or that Defendants' express claims were false, HAMP would not have paid the upfront fees or HSSN fees. Federal statutes prohibit Defendants or other lenders from receiving unallowable and illegal fees in any non-eligible loan modification candidate. The Government would not have issued payments had it known the lender claims and statements were false.

474. As a result of the Government's reliance upon the false and misleading claims and statements by Defendants, the Government has been damaged and will continue to be damaged as tens of thousands of non-eligible loan modification claims and statements which contain unallowable fees are made and paid.

475. The Government was not aware of the falsity of the claims and statements made by Defendant lenders. The Government, in reliance on the accuracy of the claims and/or statements, agreed to pay fees for hundreds of thousands of HAMP loan modifications for the purposes of assuring payment to Defendants for assisting borrowers with their loan modification. Tens of thousands of these HAMP loan modifications were denied, which has caused great economic losses to taxpayers.

476. The fraudulent acts of the Defendant lenders totally undermined one of the core purposes of the HAMP programs which is to incentivize servicers to readily distinguish eligible borrowers from ineligible borrowers so as to more efficiently help stabilize the housing market in the United States. By submitting improper claims to HAMP the servicers not only gained financially but the borrowers were under the false impression that they may get a loan modification and did not seek out alternative ways to resolve their loan issues.

477. As a result of Defendants' actions set forth above, the United States has been severely damaged and will continue to incur damages in the future.

478. Defendant lenders are liable for any and all payments which were issued based upon false claims and/or statements or with respect to which Defendant lenders failed to comply with federal statutes. Defendant lenders should be required to reimburse the Government for all costs the Government has incurred. These damages are trebled under the False Claims Act.

479. The False Claims Act requires that each Defendant lender pay the Government a civil penalty of between $5,500 and $11,000 for each false claim. This means that a penalty should be imposed for each false claim submitted to HAMP in which the lender falsely claimed it had complied with federal statutes and HAMP guidelines. A penalty should also

be imposed for each Form 571 where the Defendant lender has charged the Government for unallowable fees.

LAW OF THE CASE

480. Exhibit "XX" is incorporated by reference as though fully stated herein.

REQUEST FOR RELIEF

481. For said causes of action therefore Plaintiffs brings its suit.

WHEREFORE, the Relators/Relators prays the court issue an award in favor of Plaintiff for damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, against all Defendants, jointly and severally, and each of them, as follows:

482. On Count l, judgment against the Defendants, for treble damages and civil penalties in an amount as the Court may determine between $5,500 and $11,000 for each violation; an order requiring disgorgement of unlawful gains obtained by the Defendants as a result of their unlawful conduct; restitution or other remedial relief to compensate individual victims of the Defendants' unlawful conduct; civil penalties; and attorney fees and costs of investigation.

483. On Count ll, judgment against the Defendants, for treble damages and civil penalties in an amount as the Court may determine between $5,500 and $11,000 for each violation; an order requiring disgorgement of unlawful gains obtained by the Defendants as a result of their unlawful conduct; restitution or other remedial relief to compensate individual victims of the Defendants' unlawful conduct; civil penalties; and attorney fees and costs of investigation.

484. On Count lll, judgment against the Defendants, for treble damages and civil penalties in an amount as the Court may determine between $5,500 and $11,000 for each violation; an order requiring disgorgement of unlawful gains obtained by the Defendants as a result of their unlawful conduct; restitution or other remedial relief to compensate individual victims of the Defendants' unlawful conduct; civil penalties; and attorney fees and costs of investigation.

485. On Count lV, judgment against the Defendants, for treble damages and civil penalties in an amount as the Court may determine between $5,500 and $11,000 for each violation; an order requiring disgorgement of unlawful gains obtained by the Defendants as a result of their unlawful conduct; restitution or other remedial relief to compensate individual victims of the Defendants' unlawful conduct; civil penalties; and attorney fees and costs of investigation.

486. On Count V, judgment against the Defendants, for treble damages and civil penalties in an amount as the Court may determine between $5,500 and $11,000 for each violation; an order requiring disgorgement of unlawful gains obtained by the Defendants as a result of

their unlawful conduct; restitution or other remedial relief to compensate individual victims of the Defendants' unlawful conduct; civil penalties; and attorney fees and costs of investigation.

487. On Count VII, judgment against the Defendants, for treble damages and civil penalties in an amount as the Court may determine between $5,500 and $11,000 for each violation; an order requiring disgorgement of unlawful gains obtained by the Defendants as a result of their unlawful conduct; restitution or other remedial relief to compensate individual victims of the Defendants' unlawful conduct; civil penalties; and attorney fees and costs of investigation.

488. On Count VIII, judgment against the Defendants, for damages in an amount as the Court may determine, but may not exceed the lesser of $1,000,000 per day or $5,000,000; an order requiring disgorgement of unlawful gains obtained by the Defendants as a result of their unlawful conduct; restitution or other remedial relief to compensate individual victims of the Defendants' unlawful conduct; civil penalties; and attorney fees and costs of investigation; and Case.

489. On Count IX, judgment against the Defendants, for damages in an amount as the Court may determine, but may not exceed the lesser of $1,000,000 per day or $5,000,000; an order requiring disgorgement of unlawful gains obtained by the Defendants as a result of their unlawful conduct; restitution or other remedial relief to compensate individual victims of the Defendants' unlawful conduct; civil penalties; and attorney fees and costs of investigation; and Case.

490. On Count X, judgment against the Defendants, for damages in an amount as the Court may determine, but may not exceed the lesser of $1,000,000 per day or $5,000,000; an order requiring disgorgement of unlawful gains obtained by the Defendants as a result of their unlawful conduct; restitution or other remedial relief to compensate individual victims of the Defendants' unlawful conduct; civil penalties; and attorney fees and costs of investigation; and Case.

491. On Count XI, judgment against the Defendants, for damages in an amount as the Court may determine, but may not exceed the lesser of $1,000,000 per day or $5,000,000; an order requiring disgorgement of unlawful gains obtained by the Defendants as a result of their unlawful conduct; restitution or other remedial relief to compensate individual victims of the Defendants' unlawful conduct; civil penalties; and attorney fees and costs of investigation; and Case.

492. On Count XII, judgment against Defendants, for general damages in the sum of $50,000 multiplied by the number of days Plaintiffs were brought before the court not of record;

493. For loss of earnings according to proof;

494. That the court enter a declaratory judgment that Defendants have acted arbitrarily and capriciously, have abused their discretion and have acted not in accordance with law, but under color of law;

495. That the court enter a declaratory judgment that Defendants have acted contrary to constitutional right, power or privilege.

496. That the court enter a declaratory judgment that Defendants' actions were in excess of statutory jurisdiction, authority and short of statutory right.

497. That the court permanently enjoin Defendants from interfering in any way with Plaintiff's case;

498. That the court permanently enjoin Defendants from interfering in any way with Plaintiff's property corporately identified as 4406 N Mississippi Portland, Oregon;

499. That the court enter a declaratory judgment that the records of the court not of record are impeached for want of jurisdiction in the Court or judicial officers, for collusion between the parties, and/or for fraud in the parties offering the record, in respect to the proceedings;

500. That the court grant Plaintiffs his attorneys fees;

501. That the court grant Plaintiffs such other and further relief as the court deems just proper and equitable;

502. For interest as allowed by law; and

503. For costs of suit incurred.

504. We declare under penalty of perjury that the foregoing facts are true and correct to the best of affiants knowledge.

RESPECTFULLY DATED this __8__ day of __January__, 2020.

By _____ _legal and lawful custodian_
William X Nietzche, as trustee for SSKTR International Trust _of William Kinney III ©_
In Solo Proprio, In Proper Persona,
Sui Heredes, Sui Juris [Pro se]
Qui Tam Relator

**VERIFICATION**
_legal and lawful custodian of William Kinney III ©_

I, __William X Nietzche__ verify under oath that:
1) I have reviewed the complaint;
2) I have personal knowledge of the facts contained herein and believe them to be true;
3) The allegations of which I do not have personal knowledge, I believe them to be true based on specified information, documents or both.

[State of OREGON]
County of __Multnomah__
Signed and sworn to (or affirmed) before me on (date) __1-8__, 20 __20__, by (name(s) of individuals making statement) __William Kinney III__.

__Christina Louise Yochum__ Notary Public – [State of Oregon]

Official Stamp

OFFICIAL STAMP
CHRISTINA LOUISE YOCHUM
NOTARY PUBLIC-OREGON
COMMISSION NO. 982073
MY COMMISSION EXPIRES DECEMBER 25, 2022

FIRST AMENDED QUI TAM CLASS ACTION-Page 81 of 81